**Donald JANOW, Plaintiff,**

v.

**SCHWEITZER DIVISION OF KIMBERLY–CLARK, The United Paperworkers International Union, AFL–CIO, and The United Paperworkers International Union, Local # 1482, Defendants.**

**Civ. A. No. 79–3557.**

United States District Court,
D. New Jersey.

Nov. 13, 1980.

Stanley S. Spector, Asbury Park, N.J., for plaintiff.

Stephen Sussman, Lipkowitz & Plaut, New York City, Levinson, Conover, Axelrod & Wheaton, Edison, N.J., for defendant Schweitzer Division.

Sidney Birnbaum, Rothbard, Harris & Oxfeld, Perth Amboy, N.J., for defendants United Paperworkers International Union and United Paperworkers Union Local No. 1482.

## OPINION

DEBEVOISE, District Judge.

Plaintiff Donald Janow brought this action against the Schweitzer Division of the Kimberly–Clark Corporation, the United Paperworkers International Union of the AFL–CIO and the United Paperworkers International Union Local # 1482. Plaintiff alleges that the defendant company wrongfully discharged him from employment and that the defendant unions refused to pursue his grievance to arbitration, in breach of their duty of fair representation. Jurisdiction lies under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and 28 U.S.C. § 1337.

The matter is now before the Court on defendants' joint motion for summary judgment, pursuant to Rule 56 of the *Federal Rules of Civil Procedure.* Defendants argue that no genuine issue of material fact exists as to the unions' fair treatment of plaintiff in processing his grievance and that the duty of fair representation has not been breached as a matter of law. Defendants further argue that, absent such a breach by the union, the claim against the company must fail for lack of exhaustion of contractual remedies. Plaintiff has filed a cross–motion for summary judgment on the ground that he is entitled to arbitration of his claim by the terms of the collective bargaining agreement between the Schweitzer Division and the United Paperworkers International Union.

In accordance with Rule 56(c), the Court has examined the pleadings, affidavits and exhibits, depositions and answers to interrogatories submitted by the parties. The following facts are substantially undisputed.

Plaintiff was hired by the Schweitzer Division of the Kimberly–Clark Corporation in 1955 and served continuously at the company's Spotswood, New Jersey plant until his discharge in June, 1979. For the better part of his tenure, he held the position of "beaterman", or machine operator, in the Stock Prep Department. Prior to the incident which gave rise to this lawsuit, he had

been disciplined by the company on only one occasion, some twenty–three years earlier, for sleeping on the job.

On the morning of June 13, 1979, as he was leaving the plant after working the night shift, plaintiff was stopped by a security guard at the employees' exit. He was carrying a paper bag containing two salad bowls filled with HTH and a one-pound coffee can filled with HTH, dry chlorine utilized by the company in its paper manufacturing process. The guard searched plaintiff's parcels, discovered the HTH, and immediately called Ronald Johnson, the company's Employee Relations Manager.

A meeting was convened forthwith at which plaintiff, Ronald Johnson, union local Vice–President Steven Mischler, Stock Prep Department Head Imthiaz Azeez, and Director of Security Joseph Longo were present. While plaintiff and defendants disagree as to some details of the meeting, they are in accord as to its substance. Plaintiff admitted that he had attempted to remove a small quantity of HTH from the plant without obtaining a parcel pass and that he was familiar with the rule requiring a parcel pass before taking company property. He argued, however, that the taking of HTH had once been condoned by the company and that it was still a widespread practice among both employees and supervisors. At the close of the meeting Johnson informed plaintiff that he would be suspended for two weeks pending further investigation.

On the following day, June 14, 1979, union local Vice–President Steven Mischler met with the Spotswood plant Operations Supervisor, Gerald Vreeland, to argue against plaintiff's discharge. The Operations Supervisor, Mischler avers, "was adamant and stated that if the employee had violated Company policy against removal of property without authorization, there was no alternative to termination".

On June 15, 1979, Employee Relations Manager Ronald Johnson called a second meeting, attended by plaintiff and representatives of both the company and the union local. At that meeting, Steven Mischler alleges, he "strongly urged that Janow be permitted to retain his job, and emphasized such factors as length of service, work record, as well as the fact that the Company and its employees were considered to be a family, and that discharge was inappropriate for a single misdeed". Plaintiff concedes that Mischler fought for him "like a demon" at this meeting as well as the earlier meeting on June 13. Despite Mischler's efforts, however, Johnson announced that plaintiff was to be discharged.

Subsequent to plaintiff's discharge, Mischler discussed with him the possibility of instituting grievance procedures under the collective bargaining agreement between company and union. On June 27, 1979 a formal grievance was filed charging that discharge was too severe a penalty for plaintiff's offense and seeking reinstatement. Plaintiff was consulted about the form of the grievance and gave his approval.

The procedure for settling grievances between Schweitzer Division employees and the company is outlined in Section 17 of the collective bargaining agreement entered into between the company and the United Paperworkers International Union on June 15, 1978, and consists of four steps. Step 1 requires the filing of a written grievance signed by the employee and submitted by the shop steward to the foreman, "who shall hold a meeting and answer the grievance within forty–eight (48) hours". If no solution is reached at Step 1, "there shall be a meeting between the Plant Manager and the Grievance Committee of the Union" within five days of Step 1's disposition, which constitutes Step 2. The Plant Manager is required to give his answer at this step within 72 hours.

Under the agreement, the employee may not proceed automatically to the third step. "If the grievance is considered settled at Step 2, then the aggrieved employee must secure approval of the general membership of the Union in order to go to Step 3".

If the general membership does give its approval, the union Grievance Committee is

required at Step 3 to "take up the matter with an officer of the Company or his representative in cooperation, should they deem it necessary, with an authorized representative of the United Paperworkers International Union, A.F.L.–C.I.O.". The company representative must be one who has not appeared at any previous step. Finally, Step 4 provides that "[i]f the matter shall not be satisfactorily settled by '(3)', the matter shall be submitted to arbitration ... within thirty days of the Company's third step answer".

After filing a written grievance in accordance with the agreement, Steven Mischler informed plaintiff that the union would seek waiver by the company of steps 1 and 2. Step 1, according to Mischler, is routinely waived in discharge cases, ostensibly because a company foreman has no authority to reinstate an employee and the meeting would be futile. The union sought waiver of Step 2, Mischler alleges, because it called for a meeting with Gerald Vreeland, Operations Manager of the plant, who "had already stated his opinion that termination was appropriate in the situation presented" and, therefore, it would expedite the grievance process to proceed directly to Step 3. The company agreed to waive Steps 1 and 2, and arrangements were made for a Step 3 meeting. No attempt was made to first poll the general membership of the union or otherwise secure its approval.

The Step 3 meeting was held on July 11, 1979. Plaintiff was represented at the meeting by officials of both the local and international unions and the company was represented by John Philpott, Mill Manager. The union officials, particularly Steven Mischler, continued to vigorously protest plaintiff's discharge and plaintiff was permitted to speak on his own behalf. Shortly after the meeting, however, Mill Manager Philpott issued a brief decision stating the company's determination that plaintiff was aware of mill policy against removal of company property and upholding the discharge.

Following the company's adverse determination at Step 3, union Vice–President Steven Mischler consulted with plaintiff by telephone about further steps to be taken in the grievance procedure. Mischler advised plaintiff that the union would seek an extension of the thirty–day requirement for submitting the grievance to arbitration because the union had no scheduled summer meetings and a vote of the union would be necessary before going to arbitration.[1] Accordingly, Mischler submitted a written request to the company for a 60–day extension, which the company promptly granted.

During the first week in August, the Executive Board of the union local met to review the grievance filed on plaintiff's behalf. The Executive Board is comprised of the local's President, Vice–President, Recording Secretary, Treasurer, Financial Secretary, and Chief Shop Steward. According to the affidavit of Steven Mischler, who had succeeded to the local's presidency on July 27, 1979, the Executive Board considered the matter and voted to recommend against arbitration. The Board's vote, Mischler alleges, was based upon its determination that the company had sufficient evidence of plaintiff's wrongdoing to justify discharge. The Board notified plaintiff of its decision by letter dated August 8, 1979, which read as follows:

Grievance # S.P. 25 has been rejected for arbitration by your Union Executive Board. You now have the right to present the grievance to the union membership at the union hall September 4, 1979 at 7:30 P.M.

On August 26, 1979, President Mischler wrote plaintiff to notify him that the Sep-

---

1. Plaintiff concedes in his deposition of June 11, 1980 that he spoke with Mischler about the need for an extension and a union vote. In an affidavit dated August 18, 1980, however, plaintiff alleges that "I was advised by Steven Mischler at the end of the third step grievance procedure that this matter would be processed

to arbitration and not to worry about it." Even if the matter were material to the outcome of the case, and I believe it is not, plaintiff may not lightly disavow earlier testimony in order to raise a genuine issue of fact for purposes of summary judgment. *See* Rule 56(g), *Fed.R. Civ.P.*

tember 4th union meeting would be held in two parts "because it has become necessary for us to have nominations for Vice President of the local". The meetings were to be held at 12:45 P.M. and 7:30 P.M., and plaintiff was informed that he would have to attend both to present his grievance to the membership.

Before the September 4th meetings, plaintiff requested that his attorney be permitted to speak to the union membership on his behalf. President Mischler refused plaintiff's attorney permission to attend the meeting itself on the ground that union policy prohibited non–union members from participating in meetings unless invited to explain benefit and insurance programs to the membership. Mischler did, however, inform plaintiff that his attorney could meet with union members in a bar through which members would have to pass to enter the meeting hall.

The union meeting was held in due course on September 4, 1979, and plaintiff appeared at both the afternoon and evening sessions in order to present his case. The parties have not submitted a clear tally of the number of members in attendance, but the depositions and exhibits indicate that not more than twenty, out of a total membership of approximately 450, were present at both sessions combined. At each session a representative of the union Executive Board announced the Board's recommendation that the grievance not be submitted to arbitration, without explanation of the basis for its decision; then plaintiff was permitted to make a statement on his own behalf; the floor was opened to comments from the members either for or against sending the case to arbitration; and, finally, a secret ballot was held. The result of the balloting, according to the union's minutes of the meeting, was 7 votes in favor of sending the matter to arbitration and 10 votes opposed. On the basis of this vote, the union determined not to pursue arbitration.

Subsequent to the September 4th meeting, plaintiff's attorney sent a telegram to the union local offering, on his client's behalf, to pay the expenses of sending the grievance to arbitration. The union, however, refused. Plaintiff then filed this action alleging wrongful discharge by the company and breach of the duty of fair representation by the union.

In *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that an employee who has failed to exhaust exclusive contractual remedies provided in a collective bargaining agreement may not ordinarily resort to the courts for adjudication of a contract claim against his employer. Recognizing the potential harshness of the exhaustion requirement, however, the Court enunciated two exceptions to the rule. An employee need not fully exhaust his remedies under the collective bargaining agreement if (1) "the conduct of the employer amounts to a repudiation of those contractual procedures", or (2) "the union has sole power under the contract to invoke the higher stages of the grievance procedure" and in preventing the employee from exhausting his contractual remedies commits a breach of its duty of fair representation. "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916.

The Supreme Court clearly held in *Vaca v. Sipes* that, in determining whether a union has breached its duty of fair representation, neither judge nor jury may substitute its judgment for that of the union on the merits of the underlying claim. To do so, the Court reasoned, would unduly restrict the union's freedom to settle claims in good faith. Rather, the aggrieved employee must prove arbitrary, discriminatory, or bad faith conduct on the part of the union in *processing* his grievance.[2] Only if

---

**2.** The question whether a union has acted arbitrarily is not, of course, entirely separable from the merits of the underlying claim. The strength or weakness of an employee's case against his employer unavoidably colors the strength of his claim against the union for arbitrarily processing his grievance.

he succeeds may a court compel arbitration or proceed to the merits of the underlying claim.

The defendant company and the defendant unions jointly argue that, on the papers submitted, no genuine issue of material fact exists as to the unions' fulfillment of their duty of fair representation; that the unions have not breached their duty of fair representation as a matter of law; and, therefore, all defendants are entitled to summary judgment as a matter of law. Under Rule 56(e) of the *Federal Rules of Civil Procedure*, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *DeLong Corp. v. Raymond Intern., Inc.*, 622 F.2d 1135 (3d Cir. 1980). On the other hand, all inferences drawn from the evidentiary sources provided by the parties must be made in favor of the party opposing the motion. *Small v. Seldow's Stationery*, 617 F.2d 992 (3d Cir. 1980).

Whether the union breached its duty of fair representation in this case raises two analytically distinct questions: first, whether the union acted in bad faith or in an arbitrary or discriminatory manner in following the procedures outlined in its collective bargaining agreement; and, second, whether the collective bargaining agreement itself, as construed and applied by the parties, is inherently violative of federal labor policy. Genuine issues of material fact exist as to each question and, therefore, summary judgment is inappropriate at this juncture.

The collective bargaining agreement between a company and a labor union lies at the heart of a duty of fair representation case, and establishes the rights and responsibilities of the contracting parties in the first instance. Federal labor law, as fashioned by the federal courts pursuant to Section 301 of the Labor Management Relations Act, serves as an overlay upon the collective bargaining agreement and defines its permissible boundaries. The grievance procedures outlined in the collective bargaining agreement between the Schweitzer Division of Kimberly–Clark Corporation and the United Paperworkers International Union differ materially from those considered in *Vaca v. Sipes* and other cases relied upon by defendants in support of their motion for summary judgment. As a preliminary matter, therefore, it must be determined whether the provisions of the collective bargaining agreement itself are consistent with the union's duty of fair representation.

The function of the duty of fair representation, at least in part, is to protect the interests of individual union members or minority groups within a union against potential abuse of authority by the union majority. "The collective bargaining system as encouraged by Congress and administered by the NLRB", the Court observed in *Vaca v. Sipes*, "of necessity subordinates the interest of an individual to the collective interests of all employees in a bargaining unit ... [T]he duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Id.* at 182, 87 S.Ct. at 912. A union, it is true, may be accorded discretion under the collective bargaining agreement to supervise the grievance machinery and thereby fulfill the salutary function of ensuring that "frivolous grievances are ended prior to the most costly and time–consuming step in the grievance procedures". *Id.* at 191, 87 S.Ct. at 917. Implicit in this award of discretion, however, is a condition that it be exercised in a reasoned and reviewable manner.

In *Vaca v. Sipes*, the Supreme Court held that where a union executive board met and considered an employee's grievance, and made a determination that insufficient medical evidence existed to justify sending the matter to arbitration, the duty of fair

representation was fulfilled as a matter of law. Importantly, the authority to determine whether the employee's grievance would be submitted to arbitration was vested by the collective bargaining agreement in the executive board alone. Consequently the Supreme Court was able to determine, on the basis of the board's prior treatment of the grievance, the lack of evidence of personal hostility by any board member against the grievant, the manner of decisionmaking, and the reasons advanced by the board to support its decision that the union determination not to go to arbitration was neither arbitrary, perfunctory, nor in bad faith.

The collective bargaining agreement currently before the Court, however, appears to vest the determination whether to pursue a grievance to higher levels not in the union executive board but solely in the general membership. The affidavits and depositions submitted by the parties indicate that the union membership has habitually exercised its discretionary power under the agreement by secret ballot and majority rule, and did so in the present case. If literally construed, the agreement would permit a majority of union members to deny an individual the right to pursue a grievance to arbitration for improper reasons, arbitrary reasons, or no reason at all. The court would be effectively deprived of its ability to review the determination and to ensure that the union properly fulfills its duty of fair representation to the aggrieved employee.[3]

There is evidence that, even though the union executive board has no role in the grievance process explicitly provided by the contract, it has exercised a supervisory function and taken upon itself the responsibility of considering and deciding upon the merits of employee grievances. Federal labor policy strongly favors such a supervisory function when bargained for by the parties to a collective bargaining agreement. The Supreme Court observed in *Vaca v. Sipes* that:

If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Id.* at 192–93, 87 S.Ct. at 917–918.

In light of this policy and the practice of the parties under the contract, it may be possible to find union executive board authority over the grievance machinery implied in the collective bargaining agreement.

The union has asserted in oral argument that, as a matter of practice: (1) the union executive board always meets to consider whether a grievant's claim should be pursued prior to the general membership vote contemplated by Section 17, Paragraph 2 of the collective bargaining agreement; (2) an executive board recommendation *favorable* to a grievant is always considered binding upon the membership and is never put to a membership vote; and (3) whenever the executive board makes a recommendation *unfavorable* to a grievant, the grievant then has the *additional* right to take his claim before the union membership, which may, by vote, overturn the unfavorable decision of the board. So construed, the collective bargaining agreement would provide the grievant with a greater opportunity to contest his discharge than is required by *Vaca v. Sipes*, and would not conflict with federal labor policy.

The union's interpretation of the collective bargaining agreement at oral argu-

**3.** Cf. *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976).

ment, however, is flatly contradicted by the testimony which the union itself elicited from the plaintiff at his deposition on June 11, 1980. At the deposition the plaintiff was asked the following questions and gave the following answers:

Q. And it's the usual practice of the Union, is it not, for the union to bring before the membership matters to determine whether the case should or should not go to arbitration?

A. Yes, it is.

Q. And you say, you testified previously you have been at Union meetings where this procedure was followed?

A. Not in this particular kind, but others, yes.

Q. Some cases involving grievances of employees?

A. Right. Right.

Q. And is it not a fact that the practice is for the executive board, the Union executive board to review the matter before it goes to the membership whether it should or should not go to arbitration?

A. Yes, it is.

Q. And is it also not a fact that the policy or the practice has been for the executive board to simply present to the membership whether it was recommending that the matter go to arbitration or not go to arbitration and leave it to the particular grievant involved the opportunity of presenting his case to the membership? Has not that been the practice?

.    .    .    .    .

A. Right. Yes, it is.

Q. And is it not also a fact that in instances that you have witnessed where the executive board had recommended a case go to arbitration they were over-turned by the membership who decided that it not go to arbitration?

A. Yes.

Q. And that determination stood and the case did not go then?

.    .    .    .    .

A. Right. You're right.[4]

Were this the practice under the collective bargaining agreement, the union executive board could not be said to have full authority over the grievance machinery.[5] The division of responsibility under the contract, therefore, is a genuine issue of material fact and may not be resolved on a motion for summary judgment.[6]

As to the unions' fulfillment of the duty of fair representation in following the grievance procedures, plaintiff advances no facts to suggest that the defendant unions acted in bad faith or in an arbitrary or discriminatory fashion at any stage prior to the Executive Board meeting held in early August, 1979, at which time the board made a decision to recommend against arbitration. Indeed, in his June 11, 1980 deposition, plaintiff stated that "Steve [Mischler] fought like a little demon for me, he really did at the [Step 3] meeting. The only time that, like I say, that he showed signs of no fight to me is whenever he sent me the letter that he wasn't going to arbitrate the case." At another point in his deposition plaintiff stated that the union pressed for his reinstatement through the third step of the grievance procedure "one hundred per cent".

Plaintiff has also failed to submit any evidence to indicate lack of good faith, arbitrariness, or discrimination at the Executive Board meeting in early August, nor has he adduced any facts from which such an in-

---

4. Plaintiff's deposition at pp. 122–24.

5. Even if the executive board does not have plenary authority over the grievance procedures, a reasoned recommendation adopted by a vote of the union membership might be reviewable and therefore not in conflict with federal labor policy. Plaintiff has raised an issue of fact, however, as to whether the board supplied any reasons at all for its recommendation at the September 4, 1979 membership meeting.

6. While the construction of an unambiguous contract is a question of law for the court, the meaning of a contract which is ambiguous or requires extrinsic evidence for its interpretation is a question for the factfinder. *See Gray v. Joseph J. Brunetti Construction Co.*, 266 F.2d 809 (3d Cir. 1959).

ference could be drawn. According to Steven Mischler's affidavit, the committee considered plaintiff's grievance at the meeting and decided that it was not sufficiently colorable to merit arbitration. Insofar as the Executive Board had authority under the collective bargaining agreement to make such a decision, this Court is not entitled, under *Vaca v. Sipes*, to substitute its judgment for the board's on the merits of the claim. As to the manner in which the board reached its conclusion, "mere allegations without a concomitant factual showing of lack of good faith does not set forth a claim". *Marietta v. Cities Service Oil Co.*, 414 F.Supp. 1034 (D.N.J.1976).

Plaintiff submits that a new member was appointed to the Executive Board shortly before the August meeting and that this member's lack of personal knowledge of plaintiff's grievance tainted the fairness of the Board's vote against arbitration. Clearly, however, this fact is not material to the issue of the union's fulfillment of its duty of fair representation. *Vaca v. Sipes* requires a good faith and non-arbitrary consideration of an employee's claim by the union, not first-hand knowledge of its details by every official who participates in the decision whether to go to arbitration. No triable issue of fact, therefore, exists as to the fairness of the executive committee's determination to recommend against submitting plaintiff's grievance to arbitration.

Plaintiff contends that the vote of only 17 members at the September 4, 1979 meeting, out of a total membership of 450, was arbitrary and violative of the union's duty of fair representation. Plaintiff also submits, in support of his claim of arbitrariness, that his attorney was denied permission to attend the membership meeting; that the meeting was split into an afternoon and an evening session; and that no prior notice of his grievance was given to the membership before the meeting. While neither party submitted the union by-laws or constitution, plaintiff has conceded at argument that the September 4 membership meeting was regularly called and conducted. Furthermore, plaintiff has advanced no facts from which an inference of bad faith could be drawn. As a matter of

law, therefore, the steps taken by the union in calling and conducting the meeting do not constitute a breach of the duty of fair representation.

Finally, plaintiff argues that at the September 4th meeting his shop steward, a union official, spoke out against him at the meeting and falsely accused him of earning large sums of money from the sale of company HTH. *Vaca v. Sipes* contemplated that the personal hostility of a union officer might be a material factor in determining a union's fulfillment of its duty of fair representation. *Id.* at 194, 87 S.Ct. at 918. Resolving all inferences in favor of the plaintiff, therefore, this matter raises a genuine issue of material fact and is appropriately left for factual development at trial.

For the foregoing reasons, defendants' joint motion for summary judgment will be denied.

Plaintiff has cross-moved for summary judgment on the ground that he is entitled, as a matter of law, to arbitration of his grievance by the terms of the collective bargaining agreement between the company and the union. Section 17 of the agreement, he contends, provides that a grievant may not proceed from Step 2 to Step 3 without first obtaining the approval of the general membership. If the grievant does complete Step 3 without a satisfactory settlement, however, the contract provides in mandatory terms that the matter "shall be submitted to arbitration to the Federal Mediation and Conciliation Service within thirty days of the Company's third step answer". Since the union and the company waived Steps 1 and 2, plaintiff argues, and proceeded directly to Step 3, he now has an absolute right to proceed to arbitration.

Plaintiff's argument is not without appeal. Defendants have submitted testimony, however, in the form of plaintiff's own deposition, to the effect that the union's standard practice was to vote upon grievances before they were submitted to arbitration rather than between Steps 2 and 3. (Plaintiff's Deposition at 123.) Furthermore, a factual question is presented as to whether or not the company and union officials who handled the grievance did or did

not intend, by proceeding to Step 3, to waive the union's Step 2 right to exercise authority over the grievance machinery. This, like other contractual questions raised in this case, can only be decided after further factual inquiry and must be left to trial.

Plaintiff's cross–motion for summary judgment, therefore, will also be denied.

Rule 56(d) of the *Federal Rules of Civil Procedure* provides that:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted ... It shall thereupon make an order specifying the facts that appear without substantial controversy ... Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

In the course of this opinion I have specified those factual areas which are both material and unresolved. Defendants are requested to submit a form of order.