Eileen Marie LONG

v.

INTERNATIONAL UNION OF ELEC-
TRICAL, RADIO & MACHINE WORK-
ERS, LOCAL 141 and the Markel Corpo-
ration.

Civ. A. No. 81–909.

United States District Court,
E. D. Pennsylvania.

Aug. 25, 1982.

Roger B. Reynolds, Jr., Norristown, Pa., for plaintiff.

Robert M. Abramson, Philadelphia, Pa., for defendant Local 141.

Richard Z. Freemann, Jr., Richard L. Strouse, Philadelphia, Pa., for defendant the Markel Corp.

## SUR PLEADINGS AND PROOF

LUONGO, Chief Judge.

Eileen Marie Long, plaintiff in this civil action, is suing her union, International Union of Electrical, Radio & Machine Workers, Local 141 (Local 141), and former employer, Markel Corporation (Markel), alleging that Markel suspended and later discharged her in violation of the collective bargaining agreement between Local 141 and Markel, and that Local 141 failed to fairly represent her in grievance proceedings involving both the suspension and the discharge. Plaintiff seeks reinstatement and back pay.

Following the completion of a non-jury trial held on May 17–18, 1982, the parties submitted requests for findings of fact and

conclusions of law. On pleadings, proof, and the written submissions of the parties, I make the following

## FINDINGS OF FACT

1. Plaintiff, Eileen Marie Long, is an individual residing at 413 Maple Street, Conshohocken, Pennsylvania, who was employed as an extruder operator by Markel Corporation from August 30, 1976 to May 15, 1980, and was a member in good standing of International Union of Electrical, Radio & Machine Workers, Local 141 from 90 days after her employment with Markel began until May 15, 1980. (T. 151–52; P–1).

2. Defendant, Local 141 of the International Union of Electrical, Radio & Machine Workers (Local 141), is an unincorporated association with its principal place of business at School Lane, Plymouth Township, Pennsylvania, and at all times relevant hereto was a labor organization and the exclusive bargaining representative of certain employees of Markel, including plaintiff. (Complaint ¶ 6).

3. Defendant, Markel Corporation (Markel), is a corporation with its principal place of business at School Lane, Plymouth Township, Pennsylvania, and is engaged in the manufacture of electrical insulation, high temperature coaxial cables, and plastic tubing. (T. 152, 250; Complaint ¶ 5).

4. At all times relevant hereto, Local 141 and Markel were parties to a collective bargaining agreement dated October 1, 1977. (T. 35; P–3).

5. Schedule B to the collective bargaining agreement enumerated several "shop rules" adopted by Markel pursuant to its authority to govern the conduct of its employees. (P–3, Art. XV, section 1). An employee was subject to discipline, including suspension and discharge, for the breach of these rules. (P–3, Schedule B).

6. One particular rule set forth in Schedule B provides that "[e]xcessive absenteeism without cause" is "just and proper cause for immediate discharge." The rule defines "excessive absenteeism" to mean "more than 5% within a three months' period" (P–3, Schedule B) [hereinafter, the excessive absenteeism rule shall be referred to as the "5% rule"].

7. As historically interpreted and applied by Local 141 and Markel, an employee violated the 5% rule if he or she was absent more than three days in a three-month period. (T. 93, 133). At all times relevant hereto, plaintiff knew of this interpretation of the rule. (T. 198).

8. As historically interpreted and applied by Local 141 and Markel, absences supported by a physician's excuse were counted in determining whether an employee had violated the 5% rule. This interpretation and application of the rule antedated plaintiff's employment with Markel. (T. 35–37, 190–91, 250–56, 360, 381–82).

9. Article VIII, Part One of the collective bargaining agreement concerns the right of an employee to take an extended sick leave "without pay". An employee qualifying for sick leave is entitled to receive $100 per week from an insurance carrier for up to one year from the last day worked. Article VIII, Part One does not relate to or qualify the "without cause" language of the 5% rule. (T. 37–40, 131–33; P–3, Article VIII, Part One).

10. Although Markel had the right under the collective bargaining agreement to discharge immediately a violator of the 5% rule (Finding 6, *supra*), Markel's disciplinary policy was, in practice, less severe. To encourage the habitually absent employee to "rehabilitate" himself, Markel disciplined violators of the 5% rule in the following manner: (a) First violation—verbal warning; (b) another violation within six months—written warning; (c) a violation within six months of a written warning—suspension; and (d) a violation within six months of a suspension—discharge. If six months passed without a violation, the employee's "slate" was wiped clean and the disciplinary cycle commenced anew. (T. 120–21, 281, 311–15).

11. Prior to 1980, when the events which gave rise to this lawsuit occurred, plaintiff had received the following disciplines for violation of the 5% rule:

    (a) July 29, 1977—verbal warning (T. 179–80; P–9; C–3)

(b) December 5, 1977—written warning (T. 180; P–9; C–4)

(c) April 7, 1978—three-day suspension (T. 182–83; P–9; C–7)

(d) September 5, 1978—two-day suspension (T. 184–85; P–9, C–9)

(e) June 13, 1979—verbal warning (T. 185; P–9, C–10)

(f) August 10, 1979—written warning (T. 185–86; P–9; C–11)

12. Even as measured by Markel's more liberal disciplinary policy (Finding 10, *supra*), the September 5, 1978 suspension of plaintiff referred to in Finding 10(d) was an act of leniency. Instead of discharging plaintiff, Markel merely suspended her and warned: "If this condition still continues after two suspensions she will be terminated." (C–9).

13. The April 7, 1978 suspension referred to in Finding 10(c) was imposed after plaintiff returned from a three-day absence for which she produced a doctor's certificate. (C–8). Notwithstanding her medical excuse, plaintiff did not grieve the suspension. Nor did she grieve any of the other disciplines set forth in Finding 10. (T. 182–84, 190–91).

14. On Monday, February 11, 1980, plaintiff returned to work after being absent due to illness the previous week. Although she produced a note from her family doctor stating simply that she was under his care (C–2), Markel suspended her for three days without pay for violating the 5% rule.[1] (T. 153–55; P–10; C–2).

15. Because the grievance procedures contained in the collective bargaining agreement limited the right to file a grievance to Markel and Local 141 (T. 90–92, 195; P–3, Article VII, section 1), plaintiff asked Rose Weaver, shop steward, if Local 141 would file a grievance contesting the suspension. (T. 155, 195, 356).

16. When plaintiff returned from her three-day suspension on February 15, 1980, Local 141 filed a grievance on her behalf (C–1), and an informal first step grievance meeting was held in accordance with the grievance procedures set forth in the collective bargaining agreement. (P–3, Article XII, section 2).[2] Although Theresa Storti, then President of Local 141, argued that it was unfair to suspend plaintiff, given her doctor's excuse, Markel refused to rescind the suspension because of plaintiff's overall attendance record. (T. 10–12, 94–95, 156–57). Plaintiff was present at this Step # 1 meeting. (T. 156).

17. After the first step meeting, Storti advised plaintiff that it would look better for her in subsequent grievance proceedings if she obtained a second doctor's note which reflected the contagious nature of her illness. (T. 32–35, 159). In addition, Storti prepared for further proceedings by reviewing plaintiff's attendance record which Local 141 had on file. (T. 13–14).

18. On or about February 18, 1980, a second step grievance hearing was held with plaintiff and representatives of both Markel and Local 141 present. (T. 12–13,

---

1. The record of suspension (P–10) states that plaintiff was disciplined for "excessive lateness and absenteeism." The excessive lateness charge was apparently an error for the actual basis for the suspension was plaintiff's violation of the 5% rule.

2. The grievance procedure set forth in the collective bargaining agreement provided for a four-step grievance process. Within two days of the filing of the grievance, a first step meeting is held between the grievant, the shop steward and the foreman. If either party (*i.e.*, Local 141 or Markel) is dissatisfied with the resolution of the grievance, a second step hearing is to be held within five days before a grievance committee consisting of the President of Local 141, the chief shop steward, the shop steward, representative of Markel's management and the grievant. Again if either party is dissatisfied, a third step hearing is to be held within five days before a committee consisting of representatives from the International Union, the President of Local 141, the chief shop steward, the grievant, the Personnel Director of Markel and the President of Markel or his designee. If the grievance remains unsettled after third step, the dissatisfied party has five days to place the matter in arbitration. (P–3, Article XII, section 2).

An individual employee is prohibited under the collective bargaining agreement from maintaining a lawsuit on any issue which is arbitrable under the agreement. (P–3, Article XII, section 8).

159). As in the first step meeting, Storti argued on behalf of plaintiff that plaintiff should not have been suspended because she was absent with a contagious illness and had a doctor's excuse. Markel did not question the fact that plaintiff was ill, but responded that it could not maintain production schedules with employees who had attendance records such as plaintiff's. Markel did offer plaintiff a sick leave to enable her to correct her health problem, but plaintiff refused. Then, after further discussions, Markel offered to give back to plaintiff two of the suspended days, but a one-day suspension would remain on her record. Stating that she wanted her record "cleared", plaintiff refused this offer as well. (T. 13–14, 44, 95–96, 159–60, 264–65, 341, 356–57).

19. Subsequent to the second step hearing, Storti notified Thomas Donohue, the International representative of Local 141, who was responsible for prosecuting for the local all grievances beyond the second step level. Storti explained plaintiff's grievance to Donohue and later provided him with plaintiff's attendance records. In anticipation of pressing plaintiff's grievance, Donohue reviewed arbitration decisions in cases similar to plaintiff's. Donohue also met with plaintiff prior to the third-step hearing. (T. 16, 213–14, 265).

20. A third step hearing was later held, but not within five days of the second step as required by the collective bargaining agreement. (P–3, Article XII, section 2). Markel agreed to waive the five-day requirement to accommodate Local 141. Plaintiff agreed to this extension and was not prejudiced by it. (T. 14, 138–39, 205, 210).

21. At the third step hearing, Donohue spoke on behalf of plaintiff, reemphasizing arguments made by Storti at the first and second step hearings. In addition, plaintiff produced a second doctor's note (as Storti had advised her to do after the first step hearing, *see* Finding 17, *supra*) which stated that she had been treated for "acute sinusitis and bronchitis" during the week-long absence which preceded her suspension. Her doctor described this condition as "highly contagious." (P–2). Finally, Dono-

hue argued that Markel's action of suspending plaintiff was unduly harsh, especially in light of her performance while on the job. Donohue urged Markel to pay plaintiff for the days she was suspended and to erase the suspension from her record. Markel refused to rescind the suspension, citing plaintiff's history of absenteeism and explaining that a company that tolerated such poor attendance could not operate efficiently. Markel did, however, renew the proposals that it had made at the step two hearing (*see* Finding 18, *supra*), but plaintiff again refused to accept them. After further discussions, Donohue persuaded Markel to pay plaintiff for the three days' wages she lost as a result of the suspension, but Markel agreed to do so only on condition that plaintiff be placed on strict probation for six months during which time she could be absent from work only for hospitalization or death in her family. At this point in the hearing, Donohue asked for a caucus and Markel's representative left the room. Donohue then discussed the probation offer with plaintiff. Because she wanted her record cleared, plaintiff refused to accept it. The hearing resumed and Donohue advised Markel that plaintiff wished to take the matter to arbitration. (T. 96–99, 160–61, 196, 213–14, 265–67, 274–75, 342–44, 357–65, 369–72; C–1).

22. In contravention of the collective bargaining agreement, minutes of the first, second, and third step grievance hearings were not kept. (T. 50–51, 126–27; P–3, Article XII, section 3(b)).

23. In order to allow the membership of Local 141 to vote on whether to take plaintiff's case to arbitration, Markel agreed to waive the requirement that Local 141 place the matter in arbitration within five days of the third step hearing. Plaintiff agreed to this extension and was not prejudiced by it. (T. 138–39, 205, 267; C–1).

24. A notice to the membership of Local 141 was posted in the plant stating that a membership meeting was scheduled for April 27, 1980, and that a vote of the membership would be taken at that meeting to determine whether to take plaintiff's grievance to arbitration. (T. 16–17, 163, 335).

25. Prior to the April 27, 1980 membership meeting, the executive board of Local 141 met, as was its custom, and discussed plaintiff's grievance. Storti presented plaintiff's case to the board, showed them plaintiff's records and gave her opinion that Local 141 could not win an arbitration in light of plaintiff's history of absenteeism. The board then considered plaintiff's case and decided that it would not be wise for Local 141 to take plaintiff's case to arbitration. (T. 46–47, 326–28, 337–39).

26. Plaintiff's case was then presented at the Local 141 membership meeting. Although the decision of the executive board was not presented to the members, plaintiff's case was reviewed by Storti. Storti explained plaintiff's history of absenteeism, her disciplines, Markel's settlement offers and that plaintiff had a physician's excuse for the days on which she was absent from work. At Storti's invitation, plaintiff also addressed the membership explaining that she did not feel her suspension was "fair" because she had presented a doctor's excuse. Then, as was Local 141's custom, the decision whether to take the matter to arbitration was submitted to the membership. By a show of hands, the membership voted 16 to 4 against placing plaintiff's grievance in arbitration. Storti did not vote and did not express her opinion on the merits of plaintiff's grievance to the membership prior to the vote. (T. 17–18, 47–48, 99, 164–65, 206, 215–16, 338–39; P–6).

27. The membership had sufficient information to support its decision not to take plaintiff's grievance to arbitration.

28. Immediately after the vote was taken, plaintiff asked Donohue if he could get back for her the three days' pay. Stating that he would try, Donohue explained to plaintiff that if he was successful, she would be on probation for six months. Plaintiff responded that she did not care because all she wanted was her pay. Donohue then instructed Storti to see William Briner, the Director of Industrial Relations at Markel, and try to get plaintiff the three days' pay she lost under the suspension. (T. 20, 100, 345–46, 373).

29. The morning following the membership meeting, Storti went to Briner and told him that the membership voted against placing plaintiff's grievance in arbitration. Storti then asked Briner if Markel was still willing to pay plaintiff the three days' pay. Briner said yes but on the terms expressed to plaintiff at the third step hearing; namely, that plaintiff be placed on probation for six months during which time she could not be absent from work unless she was hospitalized or suffered a death in the family. Storti agreed to this and asked Briner to draft a memorandum incorporating the terms of the settlement. (T. 20–21, 101, 268–69, 277, 316).

30. Briner later drafted a memorandum of settlement (P–4) which was signed by Briner and Storti. Plaintiff did not receive a copy of the memorandum nor did she sign it. Plaintiff's signature was unnecessary, however, because the collective bargaining agreement required only that parties to the agreement be signatories to a settlement of grievance. (T. 49–50, 269; P–3, Article XII, section 3(6); P–4).

31. In the afternoon following the meeting with Briner, Storti saw plaintiff and advised her that she would be getting the three days' pay and that she would be on probation for a period of six months. Storti also warned plaintiff that, under the terms of the probation, plaintiff could not miss a day of work unless she was hospitalized or suffered a death in her family. Storti did not advise plaintiff that acceptance of the settlement might arguably constitute a relinquishment of other rights plaintiff had under the collective bargaining agreement. (T. 20–22, 54–60, 102, 197–98, 346).

32. In fulfillment of its obligation under the terms of the settlement, Markel shortly thereafter paid plaintiff $178.56, the equivalent of three days of plaintiff's wages. (T. 236).

33. Probation was not mentioned in the collective bargaining agreement as a possible discipline for violation of the shop rules. Nevertheless, Markel had previously disciplined violators of the five percent rule by imposing probationary terms similar to

plaintiff's. In the usual case, but not always, probation was imposed as a means of affording a discharged employee a final opportunity to correct the employee's absenteeism problem. Plaintiff knew of other employees who had been placed on probationary terms similar to hers in the past. (T. 56, 88–89, 127–30, 139–40, 208, 257–63, 280–310; P–3, Article X, section 4; P–12; C–18 to C–23).

34. On May 15, 1980, plaintiff was absent from work in violation of her probation. That afternoon, Markel advised her by telegram that she was terminated for violating her probation. (T. 168, 270; P–11; C–14).

35. Although required to do so under the collective bargaining agreement, Markel did not notify Local 141 in writing, and in advance, that plaintiff was being discharged. (T. 72; P–3; Article X, section 1).

36. On May 16, 1980, notwithstanding its lack of advance notice, Local 141 timely filed a grievance on plaintiff's behalf protesting the discharge. As is the customary practice with a discharge grievance, the first step hearing was waived by Local 141. (T. 22–23, 103–05, 168, 221–22; P–3, Article X, section 2; C–15).

37. A second step grievance hearing was held a few days after the filing of plaintiff's grievance. At this hearing, Storti spoke on behalf of plaintiff, arguing that plaintiff should be reinstated. Markel refused to reinstate plaintiff because she had violated the terms of her probation. (T. 24, 168, 222–23, 347–48; C–15).

38. The five-day limitation on proceeding to third step was waived by Markel to permit Local 141 to get a representative from the international union to substitute for Donohue who was then hospitalized. (T. 83, 271).

39. Storti secured Sam DiMaria, another International representative, to perform Donohue's function. DiMaria had represented Local 141 in the past and was familiar with the collective bargaining agreement. To prepare himself to represent plaintiff at the third step hearing, DiMaria reviewed plaintiff's records and discussed the case with Storti and plaintiff. (T. 23–26, 223, 251–53, 382).

40. DiMaria presented plaintiff's case at the third step hearing, pleading with Markel to reinstate her. He argued that plaintiff should be given another chance because discharge is a serious sanction, Markel would be losing a trained employee, and plaintiff had performed satisfactorily while on the job. Markel acknowledged plaintiff's satisfactory work record, but remained adamant in refusing to rescind the discharge. For DiMaria's benefit, Markel reviewed plaintiff's history of absenteeism, its prior offers, the terms of the settlement which plaintiff had violated and emphasized that it had given plaintiff every opportunity to reform. Since she had not taken advantage of these prior opportunities, Markel stated that it had no choice but to discharge her. (T. 24–26, 223, 278–79, 348–49; C–15).

41. In order to allow the membership of Local 141 to vote on whether to take plaintiff's grievance to arbitration, Markel agreed to waive the requirement that Local 141 place the matter in arbitration within five days of the third step hearing. (T. 27, 138–39, 271).

42. Local 141 then took steps to bring plaintiff's grievance before the next membership meeting, scheduled for June 24, 1980, for a vote on whether to take her case to arbitration. A notice of the meeting was posted in the plant stating that one of the issues to be voted on was whether plaintiff's case should be taken to arbitration. (T. 28, 223, 272, 335).

43. Prior to the membership meeting, the executive board of Local 141 met and discussed the merits of plaintiff's grievance. Storti expressed her opinion that Local 141 should not take the case to arbitration because plaintiff had violated the terms of her probation. The board then considered the merits of plaintiff's grievance and decided that it would not be wise for Local 141 to take plaintiff's case to arbitration. (T. 330–31, 337–39, 349).

44. On June 24, 1980, the membership of Local 141 met to vote on whether to take

plaintiff's discharge grievance to arbitration. Before a vote was called for, Storti reviewed plaintiff's absences with the membership and said that Markel adamantly refused to rescind the discharge. Storti said nothing else except to invite plaintiff to speak. Plaintiff declined to address the membership because she "figured everybody knew why." The decision of the executive board was not revealed to the members. A vote was taken by show of hands. The tabulated vote was 8 to 5 against taking the case to arbitration. Storti did not vote. (T. 28–30, 105–06, 169–70, 223–25, 331, 335–36; P–8).

45. Rose Carlin, a member of Local 141, voted against taking the case to arbitration because she personally disliked plaintiff. (T. 238–39).

46. Despite its belief that plaintiff's grievance of her suspension lacked merit, Local 141 prosecuted that grievance vigorously, in good faith and in a nonarbitrary manner. (T. 90, 211–12, 330–332, 370).

47. In agreeing to settle the suspension grievance on condition of probation, Local 141 acted pursuant to plaintiff's instructions. Local 141's assent to the settlement was not arbitrary and not given in bad faith.

48. Despite its belief that plaintiff's grievance of her discharge lacked merit, Local 141 prosecuted that grievance in good faith and in a nonarbitrary manner. (T. 211–12, 331–32).

## DISCUSSION

Plaintiff brought this action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), asserting (1) that she was suspended and later discharged by Markel in violation of the collective bargaining agreement and (2) that Local 141 breached its duty to represent her fairly and adequately during the grievance of both the suspension and the discharge. At the outset, Markel has raised the defense that plaintiff's wrongful suspension and discharge claims are barred by her failure

to exhaust her remedies under the collective bargaining agreement. Specifically, Markel contends that plaintiff's failure to pursue either of her grievances to arbitration, the fourth and final step in the contract grievance process, precludes her from suing on the contract.

Ordinarily, a valid defense is made out by the failure to exhaust the mandatory grievance machinery provided in the collective bargaining agreement. *Republic Steel v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *Findley v. Jones Motor Freight*, 639 F.2d 953 (3d Cir. 1981). Where, however, the power to invoke the higher stages of the grievance procedure is vested solely in the employee's exclusive bargaining representative, the failure to exhaust will be excused if it is shown that the union's refusal to process the employee's grievance was wrongful. *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). In the context of this case, to prevail on her claims against Markel, plaintiff must establish Local 141's breach of its duty of fair representation *and* Markel's breach of the collective bargaining agreement. *Id.; Findley v. Jones Motor Freight, supra.* To prevail against Local 141, plaintiff need only establish a breach of her union's duty of fair representation. *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 73 n.2, 101 S.Ct. 1559, 1569 n.2, 67 L.Ed.2d 732 (Stevens, J., concurring in part and dissenting in part); *Dutrisac v. Caterpillar Tractor Co.*, 511 F.Supp. 719 (N.D.Cal. 1981).[3] Since a breach of the duty of fair representation must be shown before the merits of plaintiff's contract claims can be reached, I begin by examining the fair representation questions.

As the exclusive bargaining representative for its members, a union has "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*,

---

**3.** Of course, if plaintiff were to prevail only against the union, her recovery would be limited to those damages attributable to the union's

misconduct. *Vaca v. Sipes*, 386 U.S. at 197–98, 87 S.Ct. at 920–921.

*supra*, 386 U.S. at 177, 87 S.Ct. at 909–910. This obligation is indeed a broad one. First recognized in the context of contract negotiations, *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), it is now certain that the union's duty extends as well to the administration and processing of grievances under an existing collective bargaining agreement. *Bazarte v. United Transportation Union*, 429 F.2d 868, 871–72 (3d Cir. 1970). Thus, "[i]n administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances." *Vaca v. Sipes, supra*, 386 U.S. at 194, 87 S.Ct. at 919.

Plaintiff points to several deficiencies in Local 141's processing of her grievances, each of which she contends supports a finding that Local 141 breached its duty of fair representation. Judging from her post trial brief, plaintiff's primary attack on Local 141's representation focuses on (1) the manner in which the union decided not to pursue either of her grievances to arbitration, and (2) the union's concurrence in the condition of probation attached to the settlement of her suspension grievance.

■ Before analyzing plaintiff's arguments in detail, I can readily dispose of her additional contentions that Local 141 was derelict in failing to (a) complete various steps of the grievance procedure within the time limits set forth in the collective bargaining agreement; (b) keep minutes of the grievance hearings as required by the agreement; and (c) assert in the grievance hearings that it was a breach of contract to suspend plaintiff for excessive absenteeism when she produced a physician's certificate to account for her absence.

First, with respect to the claim that Local 141 failed to abide by the time limitations on the grievance procedure, it need only be said that the record is devoid of any evidence which shows that Local 141's action was arbitrary or taken in bad faith. To the contrary, the evidence reveals that, in accordance with prior practice, Markel and Local 141 agreed to waive the time requirements in plaintiff's case. Moreover, plaintiff concurred in Local 141's action and admitted that she was not prejudiced by the waivers.

Second, plaintiff complains that Local 141 failed to adequately process her grievances by neglecting to keep minutes of the grievance hearings as required by the collective bargaining agreement. This position is meritless. The record contains no evidence of bad faith, and "proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation," *Bazarte v. United Transportation Union, supra*, at 872. In addition, it should be emphasized that the omission to keep minutes in no way interfered with Local 141's presentation of plaintiff's grievances and did not affect the outcomes thereof.[4]

Third, plaintiff maintains that Local 141 unfairly represented her during the suspension grievance by failing to assert that it was a breach of the collective bargaining agreement for Markel to suspend her for "excessive absenteeism without cause" when she produced a physician's certificate to explain her absence. Plaintiff attributes Local 141's omission to Storti's ignorance of certain provisions of the collective bargaining agreement. From this premise, plaintiff argues that her grievance was ineptly processed and that the union breached its duty of fair representation. Plaintiff predicates this argument on *Milstead v. Interna-*

---

4. It is important to note that, with one exception, the parties basically agree as to what transpired at each grievance hearing. The only significant disagreement pertains to the terms of the final offer made by Markel at the third step hearing of the suspension grievance. Plaintiff maintains that Markel's offer—to restore the three days' pay she lost under the suspension—was conditioned on her suspension remaining of record. Local 141's and Markel's recollection is that the offer was conditioned on a six-month term of probation. To be sure, had accurate minutes been kept, this court would have been in a better position to resolve this significant factual conflict. But Local 141's neglect to keep minutes, by itself, is not so egregious as to rise to the level of arbitrary or bad faith conduct.

*tional Brotherhood of Teamsters*, 580 F.2d 232 (6th Cir. 1978), which held that an unfair representation claim may be established by a showing that the union processed a grievance while ignorant of contract provisions favorable to the grievant's case.

Plaintiff's argument and her reliance on *Milstead* are misplaced. In not asserting plaintiff's so-called "breach of contract defense," Local 141 did not act out of ignorance. Rather, under its interpretation of the collective bargaining agreement, absences explained by a physician's certificate are considered to be "without cause." Hence, Local 141 had a good faith reason for not asserting the breach of contract defense. Furthermore, Local 141's interpretation of the five percent rule was not unreasonable. The rule does not define the words "without cause." Accordingly, it was through the application of the rule under the existing and previous collective bargaining agreements that Markel and Local 141 arrived at their interpretation of the rule.[5] While this interpretation is different than plaintiff's, it does not conflict with the express language of the contract. I cannot conclude, therefore, that Local 141 breached its duty of fair representation by choosing not to assert the breach of contract defense. *See Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 692–93 (7th Cir. 1982).

Turning now to the real thrust of plaintiff's argument, she vehemently contends that Local 141's executive board had an obligation to evaluate the merits of her suspension and to then decide whether to pursue it further. By choosing instead to submit that decision to the union's general membership, plaintiff asserts that Local 141 abdicated its responsibility and, hence, "*per se*" violated its duty of fair representation. Alternatively, plaintiff contends that, even if it was not a *per se* breach to poll the membership, Local 141 nevertheless breached its duty of fair representation by calling for a vote of the membership without providing the members with sufficient information to reach a reasoned decision as to whether arbitration of her suspension grievance was warranted.

Instead of examining these somewhat novel legal issues in the abstract, it may be helpful to review the events leading up to the membership's decision not to take the grievance of plaintiff's suspension to arbitration. At the time plaintiff was notified of her suspension, she asked Rose Weaver, her shop steward, to file a grievance on her behalf. A grievance was timely filed, and Local 141 argued plaintiff's cause through three successive grievance hearings. The undisputed evidence establishes that, while Local 141 was unable to obtain a rescission of the suspension, it did persuade Markel to make several conciliatory offers, including an offer to restore the three days' pay that plaintiff lost because of the suspension. Because she was unwilling to settle for anything short of a total rescission, plaintiff rejected Markel's offers and stated that she would take the matter to arbitration. A meeting of the membership was then scheduled for April 27, 1980 to consider, *inter alia*, whether plaintiff's grievance should be taken to arbitration. Just prior to the membership meeting, the executive board

---

**5.** At trial, plaintiff attempted to prove that Local 141 and Markel considered an absence to be for cause, rather than without cause, if a valid physician's certificate were produced by the absent employee. Although plaintiff's proposed findings contain no request for such a finding, I nevertheless reject plaintiff's proof on the matter.

Plaintiff suggests that other language in the collective bargaining agreement somehow qualifies and gives meaning to the "without cause" language of the five percent rule. This suggestion is strained at best. The agreement nowhere defines the words "without cause." Accordingly, Markel's and Local 141's evidence of their prior practice in applying the rule is enti-

tled to considerably more weight than plaintiff's attempted elucidation of the rule. Also, I find it highly persuasive that defendants' proof of prior practice consisted, in part, of plaintiff's own employment history. As plaintiff admitted, in addition to the suspension at issue here, she had been suspended in April 1978 for excessive absenteeism and did not file a grievance, even though she had a doctor's excuse to account for her absence. Since plaintiff has not cited a single instance where defendants applied the five percent rule to excuse absences explained by a physician's certificate, I can only conclude that defendants considered such absences to be "without cause."

of Local 141 met and discussed plaintiff's case. After reviewing her attendance records, her history of disciplines for excessive absenteeism and Markel's action, the executive board concluded that plaintiff's grievance was not meritorious and that, therefore, arbitration was inappropriate.[6]

The membership meeting immediately followed the executive board meeting. Storti told the membership that plaintiff had been suspended for excessive absenteeism and that plaintiff disagreed with the suspension because she had a doctor's excuse for the days she was absent. Storti also informed the membership of plaintiff's attendance record and Markel's offers to settle the grievance. Nothing was said about the terms of the collective bargaining agreement, and no mention was made of the executive board's opinion as to the merits of plaintiff's grievance. Before calling for a vote, Storti invited plaintiff to speak on her own behalf. Plaintiff accepted the invitation, but stated only that she felt the suspension was unfair because she had a doctor's excuse. A vote was then taken with the membership determining by a vote of 16 to 4 not to pursue the matter to arbitration. The vote was by show of hands.

On the basis of these facts, I cannot conclude that the membership had insufficient information to reach a reasoned decision. Plaintiff suggests that the membership should also have been told that the collective bargaining agreement did not contemplate the imposition of discipline for excessive absenteeism when the employee had a doctor's excuse. I disagree. As stated earlier, Local 141's interpretation of the excessive absenteeism rule differs from plaintiff's. Plaintiff had the opportunity to inform the members of her interpretation, but she failed to do so. It was not Local

141's duty to brief the membership on arguments which plaintiff apparently never advanced prior to this lawsuit. The membership had been told that plaintiff had a doctor's excuse, and plaintiff stated her conviction that the suspension was unfair because she was under a physician's care. Thus, at least the factual predicate for plaintiff's legal argument was presented to the membership. The membership presumably considered those facts along with the information concerning plaintiff's history of absenteeism and prior disciplines. Possessing all of this information, the membership was certainly able to make a reasoned decision as to whether arbitration of plaintiff's grievance was warranted. Therefore, unless it was improper *per se* to have the membership decide whether to pursue the grievance further, Local 141 did not breach its duty of fair representation by determining not to take the grievance of plaintiff's suspension to arbitration. It is to plaintiff's unfair representation *per se* theory that I now turn.

The central premise of plaintiff's unfair representation *per se* theory is that judicial review of the membership's collective decision is virtually impossible. In other words, plaintiff asserts that without questioning each member as to the basis for his or her vote, the court has no way of knowing whether irrelevant or improper considerations were brought to bear. Plaintiff further maintains that such questioning is not a viable alternative because the identity of the persons to be questioned would not be available unless "the grievant ... [stood] at the entrance to the meeting hall and record[ed] the names of every person who attended the meeting." (Plaintiff's Post Trial Brief at 6).

---

**6.** Up to and including the April 27, 1980 meeting of the executive board, there is nothing to indicate that Local 141 unfairly represented plaintiff in processing the suspension grievance. There is absolutely no evidence of discriminatory treatment, nor is there evidence that Local 141 acted out of animosity toward plaintiff. Indeed, all evidence points to the contrary. Notwithstanding its belief that plain-

tiff's grievance lacked merit, the union vigorously pursued the grievance and did obtain some concessions from Markel. While plaintiff may have been dissatisfied with the outcome through step three of the grievance process, it cannot be said that Local 141's representation fell below minimum standards of acceptable performance.

Plaintiff constructs her legal argument on *Janow v. Schweitzer Division of Kimberly-Clark*, 503 F.Supp. 973 (D.N.J.1980), which on the surface is factually similar to the case at bar. According to my research, *Janow* is the only reported decision to question the propriety of utilizing a plebiscite to determine whether the higher stages of the grievance machinery should be invoked. As such it requires close examination.

The plaintiff in *Janow* filed a grievance to protest his discharge for removing company property without authorization. The collective bargaining agreement then in effect between his employer and his union provided for a four-stage grievance process with arbitration as the fourth and final stage. Further, under the collective bargaining agreement, approval by a majority of the union membership was necessary to take a grievance to arbitration. In Janow's case, the union processed his grievance through the first three stages, but was unable to reach a satisfactory settlement with the company. The union advised Janow that a vote of the union would be necessary before going to arbitration. Before the next scheduled meeting of the membership, the executive board of the union met, considered Janow's grievance, and voted to recommend against arbitration. At the membership meeting held a few weeks later, "the union Executive Board announced the Board's recommendation that the grievance not be submitted to arbitration, without explanation for the basis of its decision." 503 F.Supp. at 977. Janow was then permitted to speak, the floor was opened for comment, and a secret ballot was held. The membership voted 10 to 7 against taking the matter to arbitration.

Janow subsequently brought suit against his former employer for wrongful discharge and against his union for breach of its duty of fair representation. On the basis of the foregoing undisputed facts, the defendants moved for summary judgment arguing that the union had fulfilled its duty of fair representation. Judge Debevoise, however, was not so certain that the union had adequately represented Janow and, therefore, denied the motion. Particularly troubling to the court was the manner by which the union determined not to pursue the grievance to arbitration. Indeed, the court implied that the collective bargaining agreement before it might be inherently inconsistent with the union's duty of fair representation.

> The collective bargaining agreement currently before the Court, however, appears to vest the determination whether to pursue a grievance to higher levels not in the union executive board but solely in the general membership. The affidavits and depositions submitted by the parties indicate that the union membership has habitually exercised its discretionary power under the agreement by secret ballot and majority rule, and did so in the present case. If literally construed, the agreement would permit a majority of union members to deny an individual the right to pursue a grievance to arbitration for improper reasons, arbitrary reasons, or no reason at all. The court would be effectively deprived of its ability to review the determination and to ensure that the union properly fulfills its duty of fair representation to the aggrieved employee.

*Id.* at 979 (footnote omitted). However, the court also recognized that the deficiencies in the collective bargaining agreement might, in practice, be cured by the executive board's exercise of supervision over the determination of whether a particular grievance had merit. Whether such supervision had been exercised in Janow's case was a question of fact. Thus, the court denied the motion for summary judgment.

Plaintiff here argues that the facts of her case are four-square within the "holding" of *Janow*—it is unfair representation *per se* to vest the membership with the discretion to invoke the higher stages of the grievance machinery. Plaintiff requests that I follow *Janow* and find that Local 141 breached its duty of fair representation. Defendants, on the other hand, maintain that *Janow* is neither supported by precedent, nor consistent with national labor policy.

Having considered plaintiff's legal theory at great length, I cannot accept it. The

executive board of Local 141 met and concluded that the suspension grievance lacked merit and that it would not be prudent to arbitrate the matter. Had the executive board gone no further, it would have fulfilled its duty. Plaintiff suggests, however, that the result should be different because the executive board went a step further and asked the membership to decide on arbitration. The argument belies reason.

Plaintiff had no absolute right to have her grievance taken to arbitration. *Vaca v. Sipes, supra*, 386 U.S. at 191, 87 S.Ct. at 917. Local 141 did have the duty to exercise in a good faith and nonarbitrary manner its discretion over whether to invoke arbitration, an obligation which it satisfied when its executive board determined that it was not advisable to arbitrate the suspension grievance. There is not a hint of evidence to suggest that the board's decision was arbitrary or otherwise improper. The membership meeting served as a forum for plaintiff to argue her cause to the membership. Since Local 141 had no obligation to provide plaintiff with this "second chance," I cannot see how its doing so is somehow a breach of its duty of fair representation.

The holding in this case is a narrow one. The decision might conceivably have been different had the executive board failed to assess the merits of plaintiff's grievance before submitting to the membership the decision whether to arbitrate. Those facts are not before me, nor is there before me a situation in which the executive board concluded that a grievance had merit, only to be overridden by a decision of the membership not to pursue the matter further.

I note that these hypotheticals appear to be the underlying basis for the decision in *Janow* which, unlike the instant case, was decided on a less than full record. It is for this reason that I believe that *Janow* is not inconsistent with my decision in this case. As I read Judge Debevoise's opinion, it appears that his uppermost concern was with the adequacy of the executive board's consideration and decision as to the merits of the grievance before it. Indeed, he recognized: "In *Vaca v. Sipes*, the Supreme Court held that where a union executive board met and considered an employee's grievance, and made a determination that insufficient medical evidence existed to justify sending the matter to arbitration, the duty of fair representation was fulfilled as a matter of law." *Janow v. Schweitzer Division of Kimberly-Clark, supra*, 503 F.Supp. at 978–79. However, at the same time, Judge Debevoise expressed concern that the membership might have authority to override an executive board recommendation favorable to the grievant. As I stated earlier, that situation is not before me. It is one thing to indulge in such speculation on a motion for summary judgment and quite another after a trial on the merits. On the facts as actually presented, the merits of plaintiff's grievance were fairly and adequately considered by the executive board. She was entitled to nothing further. The vote of the membership merely served to confirm what the executive board had already decided—arbitration of plaintiff's suspension grievance was not advisable.

Even if Local 141 did not act improperly in determining not to take her grievance to arbitration, plaintiff maintains that Local 141 breached its duty of fair representation by settling the grievance without her knowledge and on terms unfavorable to her. More particularly, plaintiff contends that the condition of probation was not authorized by the collective bargaining agreement and that the meaning of probation was not adequately explained to her.

There is simply no basis in fact for plaintiff's argument that she was unaware of the terms and effect of the settlement. According to my findings, Markel offered at the third step grievance hearing to pay plaintiff her three days' pay on condition that she be placed on six months probation. The terms of the probation provided that plaintiff could not be absent unless she were hospitalized or unless someone in her family died. Plaintiff, at that time, rejected Markel's offer. However, after the membership voted against taking her grievance to arbitration, plaintiff asked Tom Donohue if it was still possible to get her three days' pay. Donohue reminded her that Markel's offer had been conditioned on probation and that if he were successful in

restoring her pay, the condition of probation would likely be attached. Plaintiff responded that her sole concern was in receiving the pay. At Donohue's instruction, Storti went to Markel the following day and inquired whether Markel's offer to restore plaintiff's pay was still open. Bill Briner responded in the affirmative for Markel, but emphasized that the offer remained conditioned on probation. Storti accepted the offer, and an agreement of settlement was subsequently drawn up and signed by representatives of Markel and Local 141.[7] Later that day, Storti told plaintiff that she had succeeded in getting plaintiff her pay, but cautioned plaintiff about being on probation.

My findings clearly refute plaintiff's contention that she had no knowledge of the existence and meaning of the terms of the settlement. Implicit in my findings is a rejection of plaintiff's testimony that the condition of probation was never brought up at the third step grievance hearing. I also reject plaintiff's testimony that she had no discussions with Donohue following the vote of the membership. Quite frankly, I do not believe that Storti would have approached Briner the following day had plaintiff not requested that someone from Local 141 do so. Moreover, plaintiff's admission that she knew of instances where probation had been imposed in the past casts doubt on her testimony that she was unaware of the meaning of probation. In sum, I find that the settlement was entered into at plaintiff's insistence and that plaintiff was fully aware of the terms of the settlement.

As for plaintiff's suggestion that Local 141 should have rejected the settlement because probation is not authorized by the collective bargaining agreement, I need only repeat that Local 141 agreed to the settlement at plaintiff's behest. While this fact is sufficient to refute her claim of unfair representation, it should also be pointed out that nothing in the collective bargaining agreement forbids the imposi-

tion of probation. Accordingly, there is no basis for concluding that Local 141 acted unreasonably or in other than good faith in settling the suspension grievance. While plaintiff now realizes that three days' pay was little compensation for relinquishing her rights under the five percent rule, Local 141 did not breach its duty of fair representation by carrying out her wishes at the time.

Finally, plaintiff argues that Local 141 breached its duty of fair representation by allowing the membership to vote on whether to take the grievance of her discharge to arbitration. Once again, plaintiff maintains that the membership received insufficient information to reach a reasoned decision, and that it was unlawful in the first instance to permit the membership to vote on whether to go to arbitration.

Much of my earlier discussion of these arguments with respect to the suspension grievance applies here as well. I have found that, after plaintiff was fired for violating the terms of her probation, a grievance was immediately filed on her behalf by Local 141. Although union officials felt the grievance had little chance of success, Local 141 pursued it through the third step, but was unable to obtain plaintiff's reinstatement. Later, on June 24, 1980, the executive board of Local 141 met and discussed plaintiff's grievance of the discharge. After considering the matter, the executive board concluded that it would not be fruitful to pursue the matter to arbitration. Following the meeting, the general membership meeting was held. The president of Local 141 told the members that plaintiff had been discharged, reviewed plaintiff's history of absenteeism, and invited plaintiff to speak. Plaintiff declined, and a vote was taken. The vote was 8 to 5 against going to arbitration.

On these facts, I must reject plaintiff's unfair representation *per se* theory for the identical reasons discussed earlier. If the

7. See Finding 29.

decision to arbitrate had been left exclusively with the executive board, plaintiff's present position would be no better. The executive board would not have taken the discharge grievance to arbitration. Furthermore, plaintiff has not established by a preponderance of the evidence that the board's determination was arbitrary, discriminatory or in bad faith.

■ Likewise, I reject plaintiff's argument that Local 141 breached its duty of fair representation by providing the members with insufficient information to make an informed, collective decision. While I agree that the members had insufficient information,[8] the matter need not have been presented to them at all. Plaintiff had the opportunity to argue her cause to the membership. She did not choose to do so. The membership's vote thus serves to confirm what the executive board had already concluded; plaintiff's grievance had no merit. It is the executive board's action which is my concern. Since the board did not ignore a meritorious grievance, I can only conclude that Local 141 did not breach its duty of fair representation.

■ The inability of plaintiff to establish a breach of Local 141's duty of fair representation compels me to conclude that plaintiff has not excused her failure to exhaust her remedies under the collective bargaining agreement. Hence I need not decide plaintiff's claim that Markel breached the collective bargaining agreement by discharging plaintiff for violating the terms of her probation. Were I to do so, however, I would be impelled to hold that no breach of contract occurred in this case.

■ Plaintiff constructs her breach of contract claim on the premise that the set-tlement conditioned on probation was inconsistent with the protections afforded her under the collective bargaining agreement. From this, plaintiff reasons that it was a breach for Markel to discharge her for violating the terms of this "tainted" settlement. Plaintiff's argument is no better than its premise. As discussed earlier, the collective bargaining agreement does not provide that warnings, suspension and discharge are the only sanctions which may be meted out for violation of the shop rules. Plaintiff knew that Markel and Local 141 had agreed to the imposition of probation in previous cases. Most importantly, plaintiff was fully aware of the terms of the probation and freely manifested her consent to it. Under these circumstances, I could not find that Markel breached the collective bargaining agreement by firing plaintiff for violating her probation.

## CONCLUSIONS OF LAW

1. Subject matter jurisdiction over this action exists under 28 U.S.C. §§ 1331, 1337.

2. Plaintiff has failed to establish by a preponderance of the evidence that Local 141 breached its duty of fair representation by refusing to take the grievance of her suspension to arbitration.

3. Plaintiff has failed to establish by a preponderance of the evidence that Local 141 breached its duty of fair representation by entering into the settlement of the grievance of plaintiff's suspension.

4. Plaintiff has failed to establish by a preponderance of the evidence that Local 141 breached its duty of fair representation by refusing to take the grievance of her discharge to arbitration.

5. Plaintiff has neither exhausted her remedies under the collective bargaining

---

8. In its proposed findings, Markel asks that I infer from the following facts that the persons voting at the June 24, 1980 membership meeting were knowledgeable about the facts of plaintiff's grievance: (1) the persons present at the meeting were presumably present at the meeting held a couple of months earlier when a vote was taken on plaintiff's suspension grievance; and (2) many of the persons who voted against taking the discharge grievance to arbitration were members of the executive board. On the evidence presented, I find that it would be unreasonable to draw such an inference.

agreement nor accounted for her failure to do so.

6. Even assuming that plaintiff had excused her failure to exhaust, she has not established by a preponderance of the evidence that Markel breached the collective bargaining agreement by discharging her for violating her probation.

7. There is no liability to plaintiff on the part of either Markel or Local 141 in this case.

### ORDER

This 25th day of August, 1982, it is

ORDERED that Judgment is entered in favor of defendants, Markel Corporation and International Union of Electrical, Radio & Machine Workers, Local 141.