**Larry L. FOSTER, Plaintiff,**

v.

**BOWMAN TRANSPORTATION COMPANY, INC.; United Steelworkers of America, Local Union No. 13600, Defendants.**

**No. 81–AR–1248–S.**

United States District Court,
N.D. Alabama, S.D.

April 27, 1983.

John F. Kizer, Jr., Birmingham, Ala., for plaintiff.

Robert H. Stropp, Jr., Cooper, Mitch & Crawford, Birmingham, Ala., for United Steelworkers Local 13600.

## MEMORANDUM OPINION

ACKER, District Judge.

This cause was taken under submission after trial which was completed on March 25, 1983. At the conclusion of plaintiff's case, the Court granted the oral motion of defendant Bowman Transportation Company, Inc. (Bowman), for an involuntary dismissal under Rule 41(b), F.R.Civ.P. Plaintiff, Larry L. Foster (Foster), and the other defendant, United Steelworkers of America, Local Union No. 13600 (Local 13600), were given until April 11, 1983, to file simultaneous briefs, which both have done. The Court has carefully evaluated the oral testimony, the exhibits and the briefs, and makes the following findings of pertinent fact.

## FINDINGS OF FACT

1. Foster was an over-the-road truck driver for Bowman, an interstate carrier. He was a member in good standing of Local 13600, and within its bargaining unit. He had been an employee of Bowman and a member of Local 13600 for less than one year prior to his discharge by Bowman on November 18, 1980. Prior to his becoming a Bowman employee and a member of Local 13600, Foster had no experience with labor unions or with collective bargaining agreements, and was unsophisticated in the matter of his rights as an employee within the bargaining unit.

2. Foster is black.

3. Prior to Foster's discharge on November 18, 1980, he had never been disciplined or received any warnings whatsoever from Bowman.

4. At the time of Foster's discharge he was a beneficiary of the Collective Bargaining Agreement executed by Bowman and by United Steelworkers of America executed on behalf of Local 13600. Article V of that Agreement provides grievance machinery in the event of an employee grievance. Step 1 permits the employee, with or without the Union, to file a grievance. It contemplates an informal "attempt to settle the grievance". If the grievance is not settled in Step 1, Step 2 provides either that the grieving employee or the Union may demand a hearing with management, where the grievance may be presented in a more formal fashion. If the dispute is not settled at Step 2, Step 3 provides that the Union (*and not the employee*) may demand arbitration by the giving of written notice to Bowman. As part of the implementation of Step 3, Bowman and the Union are required to maintain a list of arbitrators. If the parties cannot select an arbitrator by agreement, or if no arbitrator is available, they must jointly request the Federal Mediation and Conciliation Service for a panel of seven arbitrators. Thereafter, either party may strike the entire list of arbitrators, in which event a new panel of seven arbitrators will be selected, and the parties must

then select an arbitrator by the striking of names alternatively until only one name remains. The arbitrator finally selected is expressly given the authority to reduce the penalty of discharge if the arbitrator finds that the offense committed was not reasonable cause for discharge, that is, unless the offense should be a violation of Article IV of the Agreement, an article of the Agreement not here pertinent. In other words, if there had been an arbitration hearing in this case, or if an arbitrator hearing is now held, the arbitrator would have the absolute right to reduce Foster's penalty, and any such decision of the arbitrator is final and binding upon Bowman, upon Local 13600 and upon Foster.

5. The Agreement further provides that at any step in the grievance procedure any party "may call in other employees" as witnesses.

6. For some period of time prior to November 17, 1980, Foster was assigned to "run double" with James Bell, another driver. Prior to November 17, 1980, a controversy arose between Foster and Bell, as a result of which Foster complained to E.B. Sargent (Sargent). Sargent is the official in Local 13600 responsible for handling grievances and for advising union members with respect to problems with management. Sargent was the President of Local 13600. He had been a Bowman employee and a driver since 1963 until he went full time with Local 13600. Prior to November 17, 1980, Foster told Sargent that while at the steering wheel of the truck in which they were riding, Bell had run off the road. When Foster complained to Bell about Bell's driving, Bell told him that he would "blow your brains out" or would "whip your ass" if Foster told on him. In discussing this problem with Sargent, Foster not only worried about his personal safety as a result of Bell's poor driving, but about his personal safety as a result of Bell's overt threat to life and limb. Sargent frankly testified that Foster made it clear that he feared for his life. Foster testified that Sargent already knew of Bell's bad driving reputation, something which Sargent denied and which the Court does not decide.

7. The record is silent as to whether Bell is white or black.

8. Sargent did tell Foster that he would do everything possible to get him separated from Bell. Sargent said this would not be difficult because it was not at all unusual for Bowman drivers to be separated where they cannot get along with each other. Sargent then talked to John Jennings (Jennings), Vice President of Local 13600 and asked him to call Jewell Wood (Wood), an officer of Bowman, to get Foster and Bell separated. Thereupon Jennings did contact Wood, who told Jennings that he would do what he could about the problem. This series of communications took place shortly before November 17, 1980.

9. On November 17, 1980, Foster received a call from Bowman's dispatcher at the terminal, informing him that he had been assigned to run double with Bell. Foster immediately telephoned Sargent. After some discussion, Sargent advised Foster not to refuse the dispatch but to refuse to ride with Bell. Foster testified that Sargent advised him not to ride with Bell. Sargent never denied giving this advice. Sargent did tell Foster that he probably would be fired, but that he felt under the circumstances that he could get Foster's job back. Foster testified that Sargent "guaranteed" him that he could get his job back. The Court is not convinced that Sargent's representation to Foster was quite this strong, although it well could have been. There is no doubt in the Court's mind but that in advance of reporting to work Foster was encouraged by Sargent to believe that his chances of reinstatement, in the event of a discharge, were very good. Although Foster's testimony and Sargent's testimony on this point are in conflict, the Court is satisfied that Foster's version is closer to the truth. Foster followed Sargent's advice. Foster went to the terminal. The dispatcher offered him the dispatch three times. Three times Foster responded, "I am not refusing the dispatch, but I am refusing to ride with Bell". The dispatcher thereupon informed Foster that he was fired. The

next day November 18, 1980, the safety supervisor, James R. Baynes (Baynes), wrote a letter to Foster terminating him. He stated as the reason, "deliberately refusing dispatch on November 17, 1980".

10. Foster immediately alerted Sargent by telephone about the discharge, at which time Sargent wrote down specific information from Foster for the filing of Foster's grievance.

11. Sargent prepared Foster's grievance on the regular form then in use, and, using the information furnished by Foster, stated the grievance as follows:

"Double with Driver James Bell. Mr. Bell would not drive at night, was continualy dozing at the wheel. Threatened to kill me if I reported him to Co. I did not refuse dispatch. I had requested the Co through the Safety dept in Atlanta and Bham Safety Dept to double me with anyone else in the Co. I knew if Bell and I were dispatched together that there would be a killing."

The grievance conspicuously contained no charge of racial discrimination.

12. Step 1 consisted of conversations between Sargent, Wood, and perhaps another representative of Bowman. Sargent did no more than to ask for Foster's reinstatement. There was no testimony as to what information was presented to Bowman or what arguments were put forward in Foster's behalf. Foster himself was not asked to participate, and did not participate. Although Foster had expressly requested of Sargent that an investigation be conducted for physical indications, such as skidmarks, at the location where he said Bell ran off the road, in order to corroborate his complaint about Bell, no such investigation was ever conducted, either by the Union or by Bowman. Neither Bell, nor Bayne, nor Wood, nor Foster was called as a witness. Foster was unsuccessful at Step 1.

13. Local 13600 requested a Step 2 hearing. Sargent does not remember attending the Step 2 hearing. Jack Strunk (Strunk), the Steelworkers' representative who was the spokesman for Foster at the hearing, does not recall whether or not Sargent was present. Wood, the Bowman representative at the hearing, testified that Sargent was not present. These facts convince the Court that Sargent did not attend. In other words, the main Local 13600 official with whom Foster communicated and who was most familiar with the facts, was not present at the hearing. Strunk's job since 1972 has been staff representative for the Steelworkers in the region which includes Local 13600. His responsibilities included the representation of employees in Step 2 and Step 3 grievances. Sargent gave Strunk no details about Foster's grievance prior to the Step 2 hearing. Strunk only knew that it involved a termination for refusal to take a dispatch. Prior to the Step 2 hearing, Strunk conducted no investigation other than his conversation with Sargent. He had not had any communication whatsoever with his "client". In other words, Strunk was purporting to represent someone he had never even interviewed. Strunk called Foster into the room. According to Strunk himself, he did no more than to beg and to plead for Foster's job, in effect, throwing himself "on the mercy of the court". Strunk conceded at the hearing that Bowman's Rules of Operation make the refusal of dispatch an offense which permits discharge. Wood was the Bowman spokesman. He was the Bowman official with whom Jennings had spoken prior to Foster's discharge about separating Foster and Bell, but at the Step 2 hearing Wood was not reminded of this fact and was not reminded of his promise to help in separating Foster and Bell. Bell was not called as a witness, although he could have been. The dispatcher was not called as a witness, although he could have been. Bayne, the safety supervisor who wrote the termination notice, was not called as a witness, although he could have been. Although naive and unfamiliar with the procedures, Foster realized that no one was really attempting to explain or to justify his position by arguing the facts and the safety issue. With Strunk's permission, Foster volunteered to answer questions and did furnish some information. Jennings and

**810**

Mahan backed Foster up when Foster pointed out that Bowman regularly separates drivers who don't get along. Bowman's spokesman did not deny this fact. Immediately after the presentation, Wood, speaking for Bowman, denied Foster's grievance. However, Wood, in his deposition, testified:

"Q. On any of those two conversations with Mr. Baynes, did Mr. Baynes tell you that Foster had talked about this problem before or was he unaware of it or do your know?

A. I don't recall him mentioning to me whether he'd heard of it before or not.

Q. So, prior to the first conversation which you had with Mr. Baynes about it, you don't know if Mr. Foster had talked to Mr. Baynes about the problem with Bell or not?

A. No, sir, I do not."

In other words, Bayne apparently fired Foster without ever considering the safety issue. Then, Wood testified as follows regarding Strunk's Step 2 presentation:

"Q. Give me what you said and what he said.

A. Well, in essence, Mr. Strunk said he didn't see why, since this was the first time that Foster had got involved in anything like this with the dispatch, why we wouldn't give him another chance, and he was coming on pretty strong with it. And my argument was that anybody in the past that had refused dispatch had been terminated and there was no way I was going to give in.

Q. And then Mr. Foster told you about these threats that were made against his life by Mr. Bell?

A. Yes, sir.

Q. Did you or anybody in your Company investigate that particular statement that was made by Mr. Foster that day?

A. The threats on his life?

Q. Right.

A. No, sir.

Q. Would that make a bearing with you, please, sir, as to whether or not to separate two drivers?

A. If it could have been substantiated, it possibly would have.

Q. But the Company made no efforts, as I understand your testimony, to check out that statement or accusation made by Foster towards Bell?

A. No, sir. Now, I'm not a hundred percent sure. It seems like I recall Bobby Baynes did interview Bell after Foster was terminated, and Bell told just the opposite of what Foster had, that Foster had made the threats to him, so that's where it was left."

14. Strunk's Step 2 concession that Bowman's Rules of Operation made refusal to take a dispatch a discharge offense is, to say the least, peculiar in light of the fact there is no Rule which provides expressly and categorically that refusal to take dispatch is such an offense. This concession is even more incomprehensible when the safety implications of Foster's situation provided a real basis for distinguishing his "refusal" from an unexcused refusal. The only disciplinary Rules which Bowman and Local 13600 rely on to justify the discharge are these:

"6. Failure to observe gateway points or to follow dispatching instructions."

"10. Refusal to accept or follow instructions of a supervisor".

One of the Rules, never mentioned by Bowman or by Strunk, requires that drivers "conduct [themselves] as gentlemen". Another Rule, not mentioned by Bowman or by Strunk, states an obvious limitation on the Rules, saying of them: "[the Rules] are distributed in an effort to help you succeed, however, none can replace *the rule of common sense*". (emphasis supplied). The Agreement itself, in Article XIV, entitled "Safety", contains the following pointed language:

"1. The Company and the Union, in compliance with applicable federal law and with the following provisions of this article, shall cooperate in maintaining conditions of employment free from recognized hazards that can be avoided or eliminated. The Company and the Union recognize their responsibilities in the *pro-*

*motion of safety* in employment." (emphasis supplied).

If one should take literally the Company Rule 10 which makes a "refusal to follow instructions of a supervisor" a violation calling for discharge, then a supervisor could call on an employee to jump out of a moving truck. Furthermore, the Agreement contains the following provision in Article XXIII, entitled "Over-The-Road-Working Conditions":

> "23. A road driver absent not more than 48 hours because of sickness or injury will not be required to furnish a doctor's certificate."

Sargent testified that he advised Foster to avail himself of this provision before Foster reported to the terminal on November 17, 1980. The Court believes that Foster was and is intelligent enough to have taken such advice if it had, in fact, been given by Sargent. If this advice had been given, Foster would not have reported to the terminal and would have thus avoided the risk of discharge. Still, the fact of the existence of Working Condition No. 23, which could have been readily exploited by Foster under the circumstances existing on November 17, 1980, and which, if invoked, would have avoided the discharge, was never argued or pointed out at Step 2. In effect, Foster was penalized for his honesty in not feigning illness.

15. On December 10, 1980, the same day the Step 2 decision was announced, Local 13600 formally decided to invoke Step 3, and on the grievance report Sargent wrote the following: "Denied, voted to arb.". At this point Sargent told Foster, and admitted it at trial, "We'll do everything possible to get your job back". He also told Foster, "We're going to arbitrate". No one at Local 13600 indicated to Foster any doubt about proceeding with the arbitration to a conclusion.

16. On or about January 10, 1981, within the time period provided by the grievance machinery, Local 13600 did what it had promised Foster it would do. It gave the required notice to Bowman to trigger the Step 3 arbitration procedure.

17. After giving the Step 3 notice, Local 13600, to the day of trial, never demanded of Bowman a selection of arbitrators under the grievance machinery. Also, from that date to the date of trial, Local 13600 has never withdrawn its Step 3 demand. Therefore, the arbitration proceeding is still pending.

18. After December 10, 1980, Foster regularly sought information from Sargent as to the status of his grievance. By May of 1981 Foster was so frustrated, so disillusioned and so desperate that he filed with the EEOC a claim of racial discrimination against Bowman. This claim was filed too late, and the question of whether or not it has merit was never reached by the EEOC, although this Court doubts that it was meritorious. Sargent learned of Foster's EEOC claim.

19. At some unstated time after December 10, 1980, Sargent talked to Bell. Bell said to Sargent no more than what could have been predicted. Bell denied running off the road and denied that he had threatened Foster. Since there was no third party observer of the trouble between Foster and Bell, it was apparent from the outset that the truth of Foster's complaint against Bell boiled down to his word against Bell's, that is, unless an investigation of the site where Foster says Bell ran off the road had been conducted. As stated, no such investigation was conducted. No one ever suggested any reason for Foster to lie about his problem with Bell. Sargent testified that he talked to others about Bell's reputation but he could not remember a single person he talked to.

20. Strunk not only had the responsibility for initiating Step 3, but he had the responsibility for processing it to conclusion, that is, in consultation with Sargent. Although the grievance made no charge of racial discrimination, Sargent concerned himself with, and was influenced by, this non-issue. In his deposition Sargent testified:

> "A. He said, in the conversation with Foster, he brought the accusations of discrimination by Bowman Transportation.

And, of course, we discussed the discrimination accusations, and I related to Larry that they might possibly be but there was no evidence in my investigation that could possibly be upheld as discrimination."

\* \* \* \* \* \*

"Q. Now, I believe in your testimony in answer to Mr. Kizer you referred to Foster bringing accusations to you of discrimination. Are you referring to racial discrimination?

A. Racial as such was never mentioned, I don't believe.

Q. What kind of discrimination was he talking about, if you know?

A. I would have assumed at that time discrimination possibly racial and dispatch."

After the claim of race discrimination was filed, Foster continued to be insistent about the Step 3 proceeding. He telephoned Sargent regularly. Strunk and Sargent *now say* that at some unnamed date they decided to discontinue the arbitration process. However, they never did withdraw the proceeding. On July 8, 1981, Sargent wrote Foster a letter containing the following statement:

"The union has not termined [sic] merit to arbitrate your case."

From reading this sentence, it can be argued that Sargent was trying to convey the message that the pending arbitration would be discontinued because the Union had determined that Foster's case was not meritorious, or it can be argued that the message was that the Union had not yet determined whether or not Foster's case is meritorious in order to decide whether or not to pursue it to conclusion. Giving Foster the benefit of doubt, as the Court must when an ambiguous writing is construed against its draftsman, the Court concludes that Local 13600 was still cogitating and had not made up its mind what to do. This interpretation is also consistent with its not withdrawing the grievance.

Sargent testified that he wrote this letter to Foster several weeks after the Step 3 notice. In fact it was six months later.

21. After Sargent's letter of July 8, 1981, the Union did nothing further on Foster's behalf. This means that between December 10, 1980, and July 8, 1981, Foster's own Union did no more than to conduct a perfunctory investigation of the Foster-Bell controversy, to beg Bowman for Foster's job back, and to wait until trial to say that it had decided, based on general and undescribed "precedents", that there was no chance of success at arbitration.

22. Local 13600 introduced into evidence three arbitration decisions, none of which was identified by Strunk or by Sargent as one of the "precedents" which they claim to have relied upon in deciding to discontinue the arbitration process. The three awards were described by Local 13600's counsel as precedents indicating that there never has been any successful arbitration of a discharge for a refusal to accept a dispatch order. The Court assumes that Local 13600 looked for the best precedents it could find to justify its alleged decision to drop the arbitration. None of these three arbitration decisions stands for the proposition which Local 13600 says it does. None of the three, either logically or inferentially, leads to the conclusion that Foster's case was not meritorious. The only one of the three which even deals with a refusal to follow dispatching instructions (Defendant's Exhibit 4), involves a driver with a long string of reprimands before his discharge. Furthermore, the arbitrator in that case expressly and pointedly held that the company may discharge its employee if he "refuses to follow a job assignment *unless there are reasons of health or safety factors involved*". (emphasis supplied). He was a perspicacious arbitrator.

23. In one discussion between Wood and Sargent, Wood stated to Sargent that to give Foster his job back would be a bad precedent because it would encourage drivers to believe they can disrupt business by refusing dispatch. Sargent testified: "Of course he [Wood] says that everytime". Sargent, then, recognized that Wood was simply making the routine and customary

argument regularly put forward by employers to justify discipline imposed on employees.

24. During the entire six month period while the arbitration proceedings languished, Local 13600 never sought legal advice as to the merit, or lack of merit, of Foster's complaint.

25. Local 13600 has to this date given no explanation for its not actually withdrawing or dismissing the grievance, which is still pending.

26. Sargent and Strunk are white.

27. Local 13600 was motivated to relegate Foster's claim to limbo by a latent but invidious hostility to his sudden claim of racial discrimination (something totally irrelevant to his grievance and therefore not a legitimate reason for Local 13600's failure to press his claim as will be discussed *infra*). This constituted discriminatory conduct by Local 13600.

28. Local 13600 was so derelict in discharging the fiduciary duty it owed to Foster that its failure to press Foster's claim constituted arbitrary conduct. Its representation was so poor that it has, thus far, deprived Foster of a fair hearing. Local 13600 simply "rolled over and played dead". Foster's own testimony that he knows of no personal animosity toward him by Local 13600 does not prevent the Court from indulging its own common sense and the logical inferences to be drawn from the undisputed facts.

29. The damages sustained by Foster as a proximate consequence of Local 13600's failures discussed above are difficult of ascertainment. In light of the conclusions of law which follow, it is unnecessary for the Court to determine what earnings, or vacation time, or lost seniority Foster may have suffered and which is traceable to Local 13600. It is impossible to conclude that such actual damages, if any, have been caused by Local 13600's failures, inasmuch as the outcome of arbitration is as yet unknown. Foster offered no proof as to the amount of attorney's fees which he claims as part of his damages. Nevertheless, the

Court, within limits, takes judicial knowledge of the time necessarily spent by Foster's lawyers in pleadings, in discovery and at trial, and judicially knows, from the many cases decided by the United States District Court for the Northern District of Alabama, the range of reasonable hourly rates charged by attorneys. Believing that approximately one half of the services rendered by Foster's attorneys is attributable to their investigation and prosecution of Foster's claim against Bowman, the Court concludes that a reasonable attorney's fee for the work performed by Foster's attorneys and thus recoverable against Local 13600 as part of Foster's damage is $2,500.00. Had Foster's attorneys offered detailed proof of this element of the damages claimed, the Court might not have been this conservative.

## CONCLUSIONS OF LAW

In his complaint against Local 13600, Foster makes the following charges:

"... Local 13600 has failed or refused to represent plaintiff's interest in that said defendant fails or refuses to submit plaintiff's grievance to arbitration."

\* \* \* \* \* \*

"... Local 13600 did not fairly, adequately and in good faith represent the plaintiff in the handling of his grievance as to his discharge in that Local 13600 arbitrarily, capriciously, discriminatorily, maliciously, and in bad faith represented the interest of plaintiff."

As against Local 13600 the complaint sought damages, compensatory and punitive, including attorney's fees, and concluded with a general prayer for "such other relief as may be just and proper".

### The Significance Of The Fact That No Relief Was Granted Against Bowman

One of Local 13600's arguments is that because the Court granted Bowman's motion under Rule 41(b) Foster cannot recover against the Union. This argument is based on the proposition that a Union cannot be assessed damages for its alleged failure adequately to represent its member if there

was no underlying breach of the collective bargaining agreement by the employer. For this proposition Local 13600 relies on *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), which, at 96 S.Ct. 1059, contains the following expression:

> "To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union."

This quotation from *Hines* is not dispositive in this case for the following reasons:

■ First, *Hines* involved an attack by an employee on an arbitration decision. Here, there is, as yet, no arbitration decision, but rather a failure by the Union to prosecute the grievance in a pending arbitration proceeding. Here, only the Union can control the arbitration process. Foster cannot.

Second, this Court granted Bowman's Rule 41(b) motion without expressing itself as to what it would have done were it the arbitrator. Although not articulated by the Court when it granted Bowman's motion, one reason for granting the motion was the pendency of the arbitration proceeding, which, in the Court's opinion, precludes a contract action on the Collective Bargaining Agreement. Foster cannot travel two routes simultaneously. Once arbitration has been invoked it must be followed to a conclusion. The granting of Bowman's motion was and is without prejudice to the pending arbitration proceeding. *See Southeast Nursing Homes v. St. Paul Fire and Marine Company*, 559 F.Supp. 883 (1982) (N.D.Ala.).

Third, plaintiff's burden of proof of a breach of the Agreement in a court of law is a more stringent burden that the Union's burden would be under the Step 3 rules set forth in the Collective Bargaining Agreement. Frankly, if this Court were sitting as an arbitrator and had available the evidence presented in this case, he would reinstate Foster in a minute. If *Hines* were deemed controlling, then this Court may have done itself a disservice by granting Bowman's Rule 41(b) motion.

Fourth, *Hines* was narrowed by *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981) where the Supreme Court explored in depth the very issue here presented. *United Parcel* makes it clear that a Union can be held liable for failure to represent its members even without the employee's simultaneously proving a violation by his employer of the collective bargaining agreement. The Supreme Court "emphasizes the importance of the finality and certainty of arbitration in the collective-bargaining context...". 101 S.Ct. 1569. In a concurring opinion, Justice Stevens correctly holds:

> "Although this claim [the claim against the Union] is closely related to the claim against the employer, the two claims are nonetheless conceptually distinct."

Further elaborating on this theme, Justice Stevens, in footnotes says:

> "2. The claims are closely related because, to prevail against the employer, the employee must establish that the union breached its duty of fair representation and that the employer breached the collective-bargaining agreement; similarly, to prevail against the union, the employee must prove that the union breached its duty of fair representation and, if he wishes to recover loss of employment damages for which the union is responsible, that the employer breached the agreement.
>
> *   *   *   *   *   *
>
> 3. By its very nature, the employee's claim that the union breached its duty of fair representation cannot be resolved in an arbitration proceeding because it arises out of the conduct of that proceeding itself.
>
> *   *   *   *   *   *
>
> 4. While an arbitration decision favorable to the employer—for example, that the discharge did not breach the collective-bargaining agreement—would be of substantial significance in an employee's suit against his union, it would not neces-

sarily be dispositive. The determination whether the employer breached the agreement may be highly relevant to the amount of damages caused by the union's alleged breach of duty, but it is not necessarily controlling with respect to the threshold question whether there was any breach of duty by the union at all. For example, if solely for reasons of racial bias, a union processes a discharged employee's grievance in bad faith, the union breaches its duty of fair representation. Cf. *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. The fact that the underlying discharge may not have violated the collective-bargaining agreement does not necessarily absolve the union of liability for its breach, although it may limit the size of the employee's recovery against the union. Thus, while a court considering an employee's claim against a union will evaluate the validity of the employer's underlying conduct, that evaluation is not central to the resolution of the duty of fair representation claim."

101 S.Ct. 1569.

Since *United Parcel* was decided, the Fifth Circuit, and at least two District Courts, paralleled the *United Parcel* rationale and have held that a Union can be liable for unfair representation without a simultaneous or a prior adjudication of employer responsibility. *Del Casal v. Eastern Air Lines*, 634 F.2d 295 (5th Cir.1981); *Dutrisac v. Caterpillar Tractor Co.*, 511 F.Supp. 719 (N.D.Cal.1981); and *Long v. International Union of Electrical, Radio & Machine Workers*, 544 F.Supp. 1375 (E.D.Pa.1982). In light of these cases, there is no preclusion of this Court's right to find Local 13600 liable to Foster even though this Court did not find Bowman liable.

*The Breadth of Local 13600's Discretion*

█ Local 13600 next points out that the federal scheme of labor-management relations contemplates, as recognized in the landmark decision of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), that the "grievance and arbitration procedure

... gives the union discretion to supervise the grievance machinery and to invoke arbitration". 87 S.Ct. 917. While it is true that a Union, as the spokesman for the bargaining unit, has a broad discretion within which to operate, *Vaca* puts a bridle on that discretion in cases where the Union's actions are "arbitrary, discretionary, OR in bad faith". (emphasis supplied). 87 S.Ct. 916. In the instant case this Court has already found as a fact that Local 13600 was guilty both of bad faith and of arbitrary conduct in the manner in which it processed or failed to process Foster's grievance, and thus breached its statutory fiduciary obligation under 28 U.S.C. § 159. *Vaca* uses the alternative "OR". This Court uses the conjunctive "AND". This Court, as will be explained in more detail *infra*, not only finds that Local 13600's refusal to complete the arbitration proceeding was "arbitrary" but that Local 13600 was guilty of "bad faith" in that it was motivated to a significant degree by its reflection upon Foster's totally irrelevant claim of racial discrimination and therefore transgressed the instruction of *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), that a Union must act "upon *wholly relevant* considerations, not upon capricious or arbitrary factors". (emphasis supplied). 84 S.Ct. 372.

Local 13600's unwillingness to prosecute Foster's grievance crosses the line between negligence and capriciousness, not because of the high degree of probability of success, if it proceeds, but because Local 13600's advice to Foster before his discharge actually contributed to his discharge, because Local 13600 promised Foster that it would do everything it could do to get his job back, including the full arbitration of his grievance, and because it did virtually nothing to live up to its promise. When Foster was promised arbitration by Sargent, he was not told that the invocation of Step 3 was subject to re-evaluation by the Union. The fiduciary obligation is stronger where the Union, as here, has reserved the exclusive right to decide whether or not to arbitrate and where the employee cannot make that decision. The Supreme Court recognized this principle in *Vaca*, when it said:

"We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. (emphasis the Court's).

* * * * * *

To leave the employee remediless in such circumstances would, in our opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract."

87 S.Ct. 914.

Local 13600 urges that *Freeman v. O'Neal Steel*, 609 F.2d 1123 (5th Cir.1980), supports the idea that the only real limit on a Union's discretion in the matter of discontinuing an arbitration is a finding of personal hostility toward the employee by the Union, and that here Foster testified that he was unaware of any such personal hostility toward him. First, as previously discussed, there is in this case evidence of "hostility", if not toward Foster personally, toward Foster's claim of racial discrimination. Without some animus or some "wholly irrelevant" consideration by Sargent and/or Strunk, it is difficult to find a logical explanation for Local 13600's indifference toward Foster's Step 3 proceeding, and for Local 13600's reneging on its commitment to Foster. "Hostility", in the sense used by the Supreme Court, need not connote hatred or personal malice. The evaluation, if any, of Foster's Step 3 grievance by Local 13600 was in terms of whether or not Bowman was guilty of racial discrimination. When Sargent wrote to Foster on July 8, 1981, telling Foster that the Union had not yet determined whether or not his grievance had merit, Sargent was, in effect, saying: "We have decided to wait you out

on this one". Under the circumstances, Foster's only recourse was to sue. Second, the Fifth Circuit in *Freeman* recognized that a Union's discretion is not "boundless" and that it is "confined by the duty to *investigate* the grievance". (emphasis supplied). 609 F.2d 1128. Here the Union's investigation was perfunctory at best and was totally ineffectual. It amounted to no investigation at all. Third, *Freeman* does not contradict *Vaca's* use of the alternative "OR", meaning that even if there were no evidence of "hostility" or of "bad faith", Local 13600 could still be held liable if its representation was "arbitrary", which this Court, *supra,* has found that it was. The Sixth Circuit well expresses this idea in *Ruzicka v. General Motors Corp.,* 523 F.2d 306 (6th Cir.1975). Fourth, when the Fifth Circuit in *Freeman* reversed the trial court's finding of hostility toward the employee by his Union, it was only because the trial court there had nothing upon which to base its finding of hostility except the demeanor of the Union's witnesses, whereas in this case Sargent's deposition reveals that he spent time pondering and disagreeing with Foster's claim of racial discrimination, when that was not an issue. By doing so, Sargent manifested a combination of bad faith and of arbitrariness.

### The Statute of Limitations Defense

The Union argues that Foster's suit is barred by some undesignated statute of limitations. This argument is unavailing.

### Local 13600's Liability for Strunk's Actions

■ According to the testimony, the ultimate responsibility for deciding what to do or what not to do about Foster's grievance was that of Strunk. At trial Local 13600 took the position that it cannot be held liable for anything which Strunk did or failed to do because Strunk was an employee of the Steelworkers and not of Local 13600. In its post-trial brief, however, Local 13600 no longer makes this argument, perhaps because it is so clear that in the context of Step 3 the acts of Strunk were

and are those of Local 13600. Local 13600 cannot insulate itself by blaming Foster's predicament on Strunk.

### Was Local 13600 Simply Guilty of Negligence?

The Union argues that if it made a mistake in the handling of Foster's grievance, its mistake constituted mere negligence and that negligence cannot form a basis for liability under *Vaca* and its progeny, including *Harris v. Schwerman Trucking Co.,* 668 F.2d 1204 (11th Cir.1982). Perhaps this argument has already been answered, but the Court will address it directly. It is true that negligence alone is not the kind of conduct condemned in *Vaca.* It is also true that Unions are not held to the high standards of lawyers in their representation of members of their bargaining units. However, the Eleventh Circuit in *Schwerman Trucking Co.* recognized the possibility that *Vaca* requires of a Union more than perfunctory performance of its duties. It there said in language peculiarly applicable here:

"... we believe that a claim that a union acted 'perfunctorily' requires a demonstration that the union *ignored the grievance,* inexplicably failed to take some required step, or gave the grievance merely *cursory attention.*" (emphasis supplied). 688 F.2d 1207.

This statement from the Eleventh Circuit well describes Local 13600's handling of Foster's grievance. If there is such a thing as a Union's conduct crossing the line from negligence to arbitrariness, Foster's case is it. This Opinion is already too long, and there is no need to reiterate or to analyze in detail Local 13600's various shortcomings, or the considerable merit of Foster's grievance. Suffice it to say that Local 13600 did just about everything wrong which it could have done wrong. Therefore, this Court is not dealing simply with ineptitude or with ineffectual representation, which are legally excusable in a Union, but with "representation which was so poor as to deprive plaintiff of a fair hearing". *Connally v. Transcon Lines,* 583 F.2d 199, 203 (5th Cir. 1978).

The level of incompetence by Local 13600 was so high as to suggest not an absence of learning or of forensic skill by Sargent and Strunk, but a callous and cavalier disregard of Foster's claim. For instance, if Sargent and Strunk had simply read the Collective Bargaining Agreement and/or Defendant's Exhibit 4 (one of the precedents which Local 13600 introduced into evidence) they would have quickly seen that SAFETY is a good reason for refusing a job assignment. They would not have had to consult legal counsel who would have advised them of *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980), where the Supreme Court fully recognized an employee's right to be protected from discharge when he chooses "not to perform his assigned task because of a reasonable apprehension of death or serious injury, coupled with a reasonable belief that no less drastic alternative is available ...". 100 S.Ct. 886. Thus far, this public policy in the labor-management area has never been invoked by Local 13600 on behalf of Foster, although it was and is surely available. Local 13600's trial brief correctly states Sargent's testimony as follows:

"Sargent recalled that the plaintiff was unequivocal in his determination not to get in the truck with Bell due to plaintiff's fear."

In other words, there was every reason for Sargent to have fully comprehended the pressing issue of Foster's safety. Yet, this issue was investigated perfunctorily, and was articulated perfunctorily.

Indulging common knowledge, this Court knows the tradition that labor arbitrators look for any legitimate reason not to impose the ultimate penalty of discharge. In its brief Local 13600 describes discharge as the "capital punishment" of labor-management relations. Without prejudging the arbitrator, it is difficult not to think that if the various components of Foster's argument are presented with minimum skill, an arbitrator would restore him to his job and can devise a lesser and more appropriate penalty than "capital punishment". When

Strunk testified, "I couldn't find anything to hang my hat on", even if the Court believed him, he was speaking only for himself. He was doing no more than arguing his case in this Court. Now that this Court has shown him where to "hang his hat", the Court doubts not that he can do much better.

### The Question of Damages

■ Local 13600 says that punitive damages are not recoverable. In this contention it is correct. *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Bowen v. United States Postal Service,* —— U.S. ——, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); and *Wells v. Southern Airways, Inc.,* 616 F.2d 107 (5th Cir.1980).

■ The Union further says that there is a failure of proof as to compensatory or special damage proximately resulting from any breach of fiduciary obligation owing to Foster. For reasons already stated, the Court agrees with Local 13600 on this, that is, except for the attorney's fees incurred by Foster in unsuccessfully prosecuting his claim in this case against Bowman. The Supreme Court has looked disapproving at the granting of attorney's fees absent statutory authority. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Therefore, this Court declines to award Foster those attorney's fees which may arise from the prosecution of the instant suit against Local 13600. However, Foster is entitled to the reasonable fees incurred in the prosecution of his claim against his employer. These are part of his ordinary damages recoverable against his Union. *Del Casal v. Eastern Airlines, Inc., supra;* and *Dutrisac v. Caterpillar Tractor Co., supra.* These attorney's fees are part of Foster's actual damages and are not the kind of attorney's fees provided under 42 U.S.C. § 1988.

### Injunctive Relief

Foster's prayer for general relief, coupled with the fact that the arbitration proceeding is still pending, leads this Court to the granting of an injunction. Where irreparable injury is suffered, and where monetary damages are inadequate, courts are constrained to exercise their traditional equity powers. *Danielson v. Local 275, Laborers International Union of North America,* 479 F.2d 1033 (2d Cir.1973); and *United States v. American Friends Service Committee,* 419 U.S. 7, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974).

■ There is nothing in the record here to suggest that Local 13600 cannot reactivate and prosecute the pending Step 3 proceeding. Nothing in the Agreement, either expressly or impliedly, effects a discontinuance of this arbitration proceeding. Unless or until the proceeding is concluded by a decision which is final and binding or by a formal withdrawal of the grievance, or by the expiration of some express deadline, none of which has here expired, the proceeding is still viable. Therefore, Local 13600 will be enjoined and required to proceed with the arbitration to a conclusion, that is, unless a result satisfactory to the parties, including Foster, can be negotiated prior to a final arbitration decision. Although the Court cannot order it, the Court indulges the hope that Local 13600 will, for the arbitration proceedings, procure the services of counsel such as the excellent lawyers who have represented it in this Court, and will allow Foster's present counsel to participate at the arbitration hearing, at Foster's expense.

### CONCLUSION

An appropriate order consistent with these Findings of Fact and Conclusions of Law, and hopefully ringing down the curtain on this comedy (or tragedy) of errors, is being contemporaneously entered.

### FINAL DECREE

Based on the Memorandum Opinion contemporaneously entered, it is hereby ORDERED, ADJUDGED and DECREED by the Court that:

1. Plaintiff's complaint against defendant Bowman Transportation Company, Inc. is DISMISSED with prejudice, except as to the arbitration proceeding.

2. Plaintiff, Larry L. Foster, shall have and recover of defendant United Steelworkers of America, Local Union No. 13600, the sum of Two Thousand Five Hundred Dollars ($2,500.00), which shall be paid directly to the attorneys of record for plaintiff, who, upon receipt thereof, shall satisfy the judgment upon the records of this Court.

3. Defendant, United Steelworkers of America, Local Union No. 13600, and all of its agents, servants and employees within its control, are hereby ENJOINED and DIRECTED to proceed with the pending Step 3 arbitration proceeding in the grievance of Larry L. Foster against Bowman Transportation, Inc. and to prosecute same to a conclusion to the best of its ability.

4. Costs are taxed against defendant United Steelworkers of America, Local Union No. 13600.